677 A.2d 634

**Robin S. STEEL et al.**

v.

**CAPE CORPORATION.**

**No. 1541, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

June 4, 1996.

Richard A. DeTar (Miles & Stockbridge, P.A., on the brief), Easton, for Appellants.

Harry C. Blumenthal (Sager A. Williams, Jr. and Blumenthal & Delavan, P.A., on the brief), Annapolis, for Appellee.

Argued before BLOOM and CATHELL, JJ., and JAMES S. GETTY, J. (retired), Specially Assigned.

CATHELL, Judge.

Robin S. Steel and other owners of property in Cape St. Claire appeal from a judgment of the Circuit Court for Anne Arundel County (Williams, J., presiding) that reversed the decision of the Anne Arundel County Board of Appeals (the Board), remanded the matter to the Board, and ordered the Board to grant a request to rezone the subject property owned by Cape Corporation, appellee, from OS (Open Space) [1] to R5 (Residential).

Appellants pose two issues for our consideration:

1. Whether the Board of Appeals'[s] finding that the OS zoning within the Cape Corporation's Lot constitutes a mistake left the Board with no discretion and required it to grant the Cape Corporation's rezoning application without regard to issues concerning public health, safety and welfare such as the inadequacy of public schools, etc.[ ]

2. Even assuming that the Board of Appeals correctly exercised its discretion in denying the Cape Corporation's rezoning application based upon circumstances relating to the public welfare, must its decision be reversed because the decision results in an unconstitutional taking of the Cape Corporation's property[.]

Initially, we note that it is apparent that neither appellee nor the trial court (and certainly not appellants or the Board) took the position that, once a zoning mistake was found,[2] the Board lacked discretion regarding whether it had to grant the rezoning based purely upon that mistake. From our reading

---

1. Appellants inform us in their brief that property zoned OS (Open Space) "permits no development."

2. No one on appeal questions the findings in respect to mistake. *See White v. Spring,* 109 Md.App. 692, 675 A.2d 1023 (1996); *People's Counsel v. Beachwood I Ltd. Partnership,* 107 Md.App. 627, 670 A.2d 484 (1995).

of the entire record, all parties and determinative entities recognized that the finding of mistake merely opened the door to a *consideration* of rezoning—*i.e.*, that the finding of mistake did not *mandate* rezoning. See *White v. Spring*, 109 Md.App. 692, 675 A.2d 1023 (1996). Consequently, we do not perceive that a resolution of appellants' first issue is necessary for our resolution of the case. Moreover, the trial judge, perceiving no issue in respect to the allegations of mistake and the Board's discretion to rezone, explicitly limited his ruling to the second issue.[3]

### The Relevant Facts

From our review of the proceedings before the hearing examiner, the Board, and the trial court, we perceive that the site in question was first rezoned from CR (Cottage Residential), permitting up to 7.2 residential units per acre, to OS (Open Space), apparently permitting no residential units, about 1971.[4] At that time, the Cape St. Claire Improvement Association's lease for the subject property had just expired. In the 1971 Anne Arundel County Comprehensive Rezoning, the Association, nevertheless, asserted that it had an ownership interest therein and, unknown to the property's owner, appellee here, requested that the property be rezoned to OS. Thereafter, still unknown to appellee, the County, apparently believing the Association to be the owner of the subject property, rezoned it as requested. It was not until 1978 that appellee learned that its property had been downzoned at the request of an entity improperly asserting an ownership interest in the property.[5] Appellee was allegedly informed that the

---

3. The trial judge's discussion of mistake and the agency's resulting discretion to rezone displayed an accurate understanding of the law.

4. We shall address the small portion of the tract now zoned R5, *infra*. Neither party contends that OS zoning permits the construction of residential housing units.

5. George Baker, the president of Cape Corporation, testified that, after 1971, the corporation was negotiating with the Association for the sale of the property. When those negotiations were not successful, the corporation put the property up for sale in 1978. Mr. Baker stated:

property would be rezoned R5, effectively curing the 1973 mistake, in a 1987 comprehensive rezoning, but this was not done.

In the 1990s (perhaps beginning in the late 1980s), appellee entered into negotiations, and, ultimately, litigation, in respect to verifying its ownership of the subject property. The dispute was resolved in appellee's favor in 1993, when this Court rendered an opinion affirming appellee's ownership of the property. Appellee then initiated the rezoning request that resulted in the circuit court decision now on appeal. We have capsulized the early history of the property in order to demonstrate how it was inappropriately downzoned initially to an open space classification. As we shall indicate, an OS (Open Space) classification was obviously intended for public property or private property whose owners seek to preserve their property's open space characteristics.

Article 28 of the Anne Arundel County Code (1967) [6] specifies:

### § 6–204. Land included.

Open Space Districts shall include:

(1) lands in the natural drainage system, including wetlands, marshlands, swamplands, and lands in the floodplain;

(2) private and public land used or proposed to be used for passive or active subdivision recreation, community recreation, or regional recreation; and

(3) lands designated as structural open space in the General Development Plan or detail plan of open space.

### § 6–205. Permitted uses.

(a) The following uses are permitted as permitted uses in Open Space Districts subject to the approval, where applica-

---

[A]nd a contract was submitted by a builder on one of the lots, and about two days [later] . . . a W. Calvin Gray, called me and said "Say, Mr. Baker, we've been told that that property is zoned open space," and I said "That can't be, it's always been zoned residential."

**6.** Any statutory references shall hereinafter be to the Anne Arundel County Code (1967), unless otherwise indicated.

ble, of the State Department of Natural Resources, the Soil Conservation Service, the Department of Public Works, the Department of Utilities, the Health Department, and the Department of Recreation and Parks:

(1) alcoholic beverage uses as ancillary to permitted uses in accordance with the provisions of § 10–118 of this article;

(2) conservation uses, practices, and structures for the maintenance of the natural environment;

(3) existing residential uses;

(4) farming or nurseries, including truck gardening, grazing of livestock, and other similar activities if:

(i) the use does not change the stability of the land; and

(ii) with the exception of grazing, the use is not located in the natural drainage system;[7]

(5) nonresidential structures, including barns, stables, and kennels, for the sheltering, breeding, boarding, hiring, or selling of an animal and for storage of crops raised on the premises, provided that the use is not permitted in the natural drainage system;

(6) nonprofit camps, including dormitories, cabins, and structures for administrative, maintenance, and custodial activities of the camp, if the structures are not located in the natural drainage system;

(7) public beaches;

(8) rights-of-way or easements to provide for access to inaccessible areas;[8]

---

7. Part of the subject property is alleged to be in a flood plain or drainage system.

8. At oral argument, appellant argued that the right to have easements on the property should be considered a viable economic use or, at least, an enhancement of whatever other uses to which this property could be put. We fail to see how easements, standing alone, are part of the equation, unless they are used to connect viable economical uses, which in this case are not permitted, or can, in some fashion, be used to generate revenue. We decline to speculate further.

(9) structures for administrative and custodial uses of the principal use of the site, if:

(i) building coverage, including parking, does not exceed 20% of the site; and

(ii) the structures are not located in the natural drainage system;

(10) temporary structures for boating, swimming, fishing, hunting, golf courses, ice skating, nature study, picnic areas, play areas, stables, and stands for the sale of products raised on the premises;

(11) permanent structures on land for hunting, golf courses, ice skating, nature study, picnic areas, play areas, and stables, if the structures are not located in the natural drainage system;

(11A) piers and ramps; and

(12) other recreational and conservation structures consistent with the objectives of an Open Space District in conjunction with the uses listed in this section.

(b) In an Open Space District, a recreational pier is permitted as a conditional use subject to the conditions of § 2–204(b)(3B) of this article.

## § 6–206. Special exceptions.

In an Open Space District, public utilities and public utility uses are permitted as special exceptions.

## § 6–207. Setback requirements.

A use or structure other than a pier, conservation use, passive recreational use, or beach in an Open Space District may not be located:

(1) less than 50 feet from any lot line; or

(2) less than 75 feet from any street right-of-way.

Section 6–202(a) states that the purpose of OS zoning is to preserve open spaces for recreational purposes, to protect persons and property from flooding and water pollution, and "to protect the County against costs if development . . . is not compatible with the natural environment." The purpose section of the statute provides further that "OS–Open Space

Districts are intended to guide, define, and protect development, communities, land uses, and environmental study areas through proper location of open space areas." Art. 28, § 6–202(b).

It is clear that OS zoning was not intended, nor does it encompass any viable residential uses in the district, unless they were grandfathered, i.e., already existing. In the present case, we have found no indication in the record that residential structures are currently on the site.

The trial judge described the uses permitted in OS zones:

The permitted uses of an OS-open space district are general recreational uses which preserve and protect the natural environment. *See* Anne Arundel County Code [Art. 28,] § 6–202, 6–205. Permitted uses on Appellant's 3.12 acre parcel would include: conservation uses and structures for the maintenance of the natural environment; farming or nurseries; nonresidential structures, including barns, stables, and kennels; nonprofit camps; temporary structures for boating, swimming, fishing, hunting, golf courses, ice skating, nature study, picnic areas, play areas, etc.; and other recreational and conservation structures. [Art. 28,] § 6–205.

The parties do not challenge that description. Moreover, there was evidence that OS zones were intended to be imposed upon either publicly controlled property or private property, at the request of the owners of that property.

Gary T. Westholm, an expert in planning, land use, and appraisal, testified before the Board that OS zoning was intended for governmentally or community-owned land. The Board of Appeals noted that, according to Mr. Westholm,

this property does not meet the definition for land in OS; this is private, not public land. The property does not comply with OS zoning which is for recreational uses, to handle flooding, and to protect the county against cost.

In its memorandum opinion, the Board discussed the witnesses called on behalf of Anne Arundel County. It noted

that Kevin Dooley, a zoning analyst for the County, presented testimony:

> He believes the open space zoning is a mistake. He explained the comprehensive rezoning process. The property had OS zoning designation throughout and there were no profiles. Open space zoning is for environmentally sensitive or recreational property. There are some sensitive areas on the property, but the portion that is the subject of the rezoning is level with no environmental effects. This is property in private ownership, and was not ever set aside for recreational purposes for the community. Therefore, it is a mistake. The General Development Plan (GDP) indicates natural features designation and low to medium density. R5 is consistent with low to medium density.

Mr. Dooley further testified:

> [T]he 1986 general development plan shows this area being in close proximity to both the natural features designation and also the low-to-medium residential designation. . . . R5 zoning is consistent with the low to medium density residential designation.
>
> . . . .
>
> . . . [I]n addressing the issue of the compatibility of the surrounding land uses this area of Cape St. Clair[e] and the area immediately surrounding this site is zoned R5 and the R5 zoning and single-family development would be consistent with the surrounding land uses.
>
> . . . So the R5 would be consistent with the critical areas designation. . . .
>
> . . . .
>
> . . . [A]ll the other standards [other than the adequacy of school facilities standard] to justify R5 zoning can be met in this case. That will be the county's position.

Other County agencies were of a like mind. The Anne Arundel Soil Conservation District "recommend[ed] approval of requests herein." The Office of the Fire Marshall had "no objection to granting the requested zoning reclassification requests." Both the Anne Arundel County Health Depart-

ment and the Department of Recreation and Parks declined to comment on the proposed rezoning. The Board then noted that "the critical area commission did not oppose rezoning" of the subject property to R5, and commented, "Outside of the school issue, all the requirements can be met" in order for the property to be rezoned. The Board then further discussed the requirements of the statute relating to rezonings:

> Since the property does not have natural features which prohibit development except in the steep slope area and the property is not held by the public, only the portion containing steep slopes should have been zoned open space. However, it is equally without dispute that this Board cannot make an affirmative finding that the public facilities are adequate. The testimony from the school personnel indicated that both the elementary and the middle school are currently over capacity and that situation is projected to continue as shown on Protestants' exhibit # 4. Since this Board is convinced of the need for the schools to have adequate capacity before any rezoning to allow the building of more homes and further over crowding of the schools, it must deny the rezoning request.

It is clear, therefore, that the Board denied the requested rezoning because of the provisions of the Anne Arundel County Code relating to the adequacy of its schools.[9] Article 3, § 2–105(a)(3) (1985), provides that property cannot be rezoned

---

9. The sections relating to rezoning discuss the necessity for adequacy of facilities generally and refer to the statute that defines a public facility. Although it is not entirely clear from the extracts and briefs, we believe that the statute, Article 26, constitutes the subdivision legislation of Anne Arundel County, and, thus, while certainly related, is not a part of the zoning regulations. If that is so, and we believe it to be so, the language of the zoning statute, Article 28, referring to the need for adequacy of public facilities, was considered below to incorporate by reference the provisions of Article 26 in the rezoning process. The parties do not challenge this procedure. Appellee, referring to Article 26, notes in its brief, without objection, that "the Board applied the following provisions ... [of Article 26]." Because no objection is made, we need not further address this matter. We shall sometimes refer to this statutory scheme as the Adequacy of School Facilities Ordinance.

unless the applicant establishes that "schools ... adequate to serve the uses allowed by the new zoning classification, ... are either in existence or programmed for construction." The adequacy of schools specifically is governed by Article 26, § 2–416 (1985):

(b) Within two years following approval of a final subdivision plat, elementary and secondary schools in the service area of the proposed subdivision shall be adequate to accommodate the school population projected to be generated from the proposed subdivision.

(c) Elementary and secondary schools in the service area of the proposed subdivision shall be considered adequate if:

(1) the school population projected to be generated from the proposed subdivision may be enrolled at schools located in the service area at which the enrollment does not exceed the State Interagency Committee school capacity guidelines as specified in the administrative procedures guide of the public school construction program; or

(2) the County Board of Education determines that the enrollment of the additional students expected to be generated from the proposed subdivision would not be detrimental to the quality of the curriculum and programs being offered at the schools, at schools in which the enrollment exceeds the State Interagency Committee school capacity guidelines.

(d) In determining whether schools exceed the State Interagency Committee school capacity guidelines, consideration shall be given to existing school population, school population projected to be generated from other subdivisions for which final plats have been approved, and all other children reasonably expected by the County Board of Education to enroll in the schools.

The Board, in applying these standards to reject the rezoning, accepted the testimony of certain school officials and officers of parents' organizations. Lawrence Ripley, the student planning director for the Anne Arundel County Board of Education, presented a letter he had written on November 16,

1993, to the Office of Planning and Code Enforcement that projected that, if R5 zoning were granted for the subject property, it would cause seven new enrollments in the various schools in the service area. He opined that school facilities "will be inadequate to handle the number of students projected." Mr. Ripley presented another letter that he had written to the same office on June 5, 1994, in respect to the appeal to the circuit court, in which he reiterated that the schools were then over capacity, although he discussed the impending construction of a new school. Even with the new school, Mr. Ripley opined, elementary school capacity would still be a problem. In his June 5, 1994 letter, he considered that, based

on the requirements of the Adequacy of Facilities Ordinance,[10] no approval can be recommended until the school population projected to be generated from the proposed subdivision can be accommodated.

At the present time ... the earliest any consideration for approval of this development would be approximately School Year 2000.

During this process, the staff, i.e., the Anne Arundel County Department of Planning and Code Enforcement, basically noted that the subject property complied with all other requirements and gave as its recommendation, "[t]he Department ... would have no objection to the granting of this [rezoning] request provided the petitioner can satisfactorily address the issue of the adequacy of public schools." Consequently, it is apparent that the Board of Appeals denied appellee's request for rezoning based upon the provisions of the statutes relating to the adequacy of schools. The proceedings before the administrative entities and the Board gradually narrowed in focus until, by the time of its decision, the Board predicated its determination upon the adequacy of school facilities, its comments as to potential density problems

---

10. Mr. Ripley's statement as to the Adequacy of Facilities Ordinance apparently is a reference to Article 26, § 2–416 of the subdivision ordinance, incorporated by reference, in Article 28, the zoning ordinance.

notwithstanding. It is also clear that the County's ordinances, as written, compelled that finding. The Board, therefore, acted correctly in applying the adequate school facilities requirements of the ordinances to deny the application. The only question that remains is that question upon which the trial court based its decision: Did the interplay between the rezoning requirements as to adequacy of public facilities resulting from what school administrators termed the Adequacy of Facilities Ordinance result in an unconstitutional taking of property?

### Resolution

We first note that the factual situation presented by this case is indeed unusual. Generally, there would not be a request to upzone the types of properties that are contemplated to be in OS zones, because they are contemplated to be properties owned by public entities or community associations that have requested that zoning classification to preserve the environmental and recreational aspects of their properties. The statute defines "Community recreation" as "recreation facilities used primarily by people living in large geographical areas of the County." Art. 28, § 6–201(b). "Subdivision recreation" is defined as "facilities or land used primarily by residents living in a recorded subdivision." *Id.* § 6–201(f). The situation in the case *sub judice* is different. An entity, i.e., a community association, by wrongfully contending that it was the owner of property it desired to preserve as a "Subdivision recreation" area for "passive ... recreation," caused the property to be downzoned to OS in order to accomplish that purpose without the knowledge of the true owner. Thus, it is clear that the prior downzoning was a mistake. Neither party to the appeal is now contending that it was not a mistake, and that issue is only indirectly before us.

Consequently, it can be said that the rezoning provisions of Article 28, incorporating by reference provisions of Article 26 regarding the adequacy of schools and other facilities, contemplated that properties in private ownership that are proposed for upzoning would be in zoning classifications other than OS

and, thus, already in a classification that permits viable economical uses; the upzoning requests would be for an increase in economic viability, i.e., an intensification of existing residential uses that in and of themselves, in a constitutional taking scenario, are already economically viable. In almost all instances, therefore, the denial of the upzoning, due to the inadequacy of school facilities, would not result in the subject property remaining in a status that had no viable economic use. Under those contemplated circumstances, the provisions in respect to school facilities, while creating a *de facto* moratorium as to upzoning in the Cape St. Claire area,[11] would not have resulted in the loss of all economically viable uses for the period at issue—in the case *sub judice*, not earlier than the year 2000 (a six-year period), because the properties would have retained existing economically viable uses. In the case at bar, however, it is alleged that the combination of the ordinances effectively foreclosed all economically viable uses of the subject property because it was mistakenly put in a classification not meant for privately owned property of this character—a classification, it is argued, that does not permit viable economical uses. The trial judge agreed with the applicant, appellee here, and based his decision solely upon the constitutional issue. As we have stated, we shall review only the correctness of Judge Williams's decision.[12]

---

11. The parties treat the Cape St. Claire area as that area, *i.e.*, the service area, analyzed for school impact purposes. Kevin Dooley, the zoning analyst for the County's Department of Planning and Code Enforcement, described the neighborhood: "[I]t centers along Cape St. Clair[e] road and extends as far east as the Little Magothy River, as far south as the intersection with College Parkway, as far west as the Cape St. Clair[e] elementary school and as far north as its intersection with Mountain Top Drive." The extent of the service area or of the neighborhood, though perhaps relevant in other cases, does not affect our determinations in the case *sub judice*.

12. There apparently were one or more other parcels owned by appellee that had also been improperly zoned OS. The circuit court similarly found the refusal to rezone those parcels to be confiscatory in nature and directed the agency to grant R5 zoning, which it did. Appellants, in the case sub judice, apparently assert some different facts here, i.e.,

## The Law

■ In undertaking a regulatory takings analysis, the first step focuses upon the appropriateness of the regulation itself. In *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), the United States Supreme Court noted, "We have long recognized that land-use regulation does not effect a taking if it 'substantially advance[s] legitimate state interests' and does not 'den[y] an owner economically viable use of his land.'" *Id.* at 834, 107 S.Ct. at 3147 (citation omitted, bracketed material in original). Under *Nollan,* the regulatory prohibition must further the end "advanced as the justification for the prohibition." *Id.* at 837, 107 S.Ct. at 3148. The Court described this requirement as the "essential nexus." *Id.*

In 1984, three years prior to the decision in *Nollan,* the Maryland Court of Appeals adopted the same standard, although it gave it a different name. *Howard County v. JJM, Inc.,* 301 Md. 256, 482 A.2d 908 (1984), was a case involving, ultimately, whether the County's exaction from a developer of land for a highway was proper. The exaction occurred when the zoning regulations required the developer to "reserve" from developing land in the path of a proposed future county or state highway. In *JJM, Inc.,* the land to be reserved was a right of way for the proposed highway that "cut a wide swath through the proposed development." *Id.* at 259, 482 A.2d 908. The reservation requirement was challenged as an unconstitutional taking of property without just compensation. After distinguishing a dedication, "the conveyance of ... land ... to the public," from a reservation, a restriction on "the right ... to use the land for anything but the restrictive purpose," 301 Md. at 270, 482 A.2d 908, the Court of Appeals discussed whether the statute there at issue furthered the end that was proffered as justification for the statute in the first place, i.e.,

---

the strips that appellants contend already permit residential use indicate preexisting viable economical use. We address these strips later.

the first step analysis of the appropriateness of the statute.[13] The Court, describing the reservation requirement as an exaction, noted:

> We bear in mind in this case the "fine line" distinction observed by Justice Holmes for the Court in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922): "The general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Mahon*, 260 U.S. at 415, 43 S.Ct. at 160. *Cf. Euclid v. Ambler Realty Co.*, 272 U.S. 365, 387, 47 S.Ct. 114, 118, 71 L.Ed. 303 (1926) ("The line which in this field separates the legitimate from the illegitimate assumption of power is not capable of precise delimitation. It varies with circumstances and conditions.").

301 Md. at 281, 482 A.2d 908. The Court of Appeals then held "that in order to exact from a developer a setting aside of land for highway purposes there must be a reasonable nexus between the exaction and the proposed subdivision." *Id.* at 282, 482 A.2d 908. This position, much earlier stated by the Court of Appeals as Maryland law in *JJM, Inc.*, became the law of the land generally when *Dolan v. City of Tigard*, 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304, was decided by the Supreme Court, on June 24, 1994, in a five to four decision.

The *Dolan* Court examined the differing approaches utilized by the various states in determining whether the degree of exactions demanded by a permit condition bore the required relationship to the projected impact. In particular, the Court discussed (1) the generalized relationship test, finding it too lax to protect property rights, and (2) the specific and uniquely attributable test, stating that it imposed too much of a burden upon government before finding the application of the ordinance then before it unconstitutional. 512 U.S. at ——, 114 S.Ct. at 2318–19. In doing so, the Supreme Court

---

13. See *Howard County v. JJM, Inc.*, 301 Md. 256, 482 A.2d 908 (1984), for a comprehensive treatment of reservation, exaction, and first step analysis.

adopted the test—although it called it the rough proportionality test—which had been adopted by our Court of Appeals as the reasonable nexus or reasonable relationship test ten years earlier in *JJM, Inc.*[14]

In the case *sub judice*, the statutory scheme satisfies the reasonable relationship test. The regulation itself involves a regulatory area that may be a reasonable application of the police power. Accordingly, our review moves to the second step of the takings analysis: Does the statutory scheme, as applied to the subject property, effectively prohibit all reasonable, i.e., viable, economical uses of that property? [15]

We opined at some length, in *Offen v. County Council,* 96 Md.App. 526, 625 A.2d 424 (1993), *rev'd in part on other grounds,* 334 Md. 499, 639 A.2d 1070 (1994), on the then trilogy of major Supreme Court land-use decisions: *First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) (*First English Church*); *Nollan v. California Coastal Comm'n, supra,* and *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).[16] We concluded that, for purposes of *Offen,* those cases had not created new law, but had restated the law and, at best, had expressed the

---

**14.** See Paul A. Tiburzi & Kurt J. Fischer, *From Nollan to Dolan: the Supreme Court Continues to Define the Takings Clause,* Land Use Inst. (1994).

**15.** We do not address the prohibition of nuisances through the regulatory power as there is no claim, nor could there be a logical claim, that residential uses, in and of themselves, are noxious. *See Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), and compare our recent case *Erb v. Maryland Dept. of the Env't,* 110 Md.App. 246, 676 A.2d 1017 (1996).

**16.** Professor Robert M. Washburn, in his article, *Land Use Control, The Individual and Society,* 52 Md. Law Rev. 162 (1993), discusses a "1987 trilogy" of cases, namely, *Nollan, First English Church,* and *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). *Keystone* has not survived with the same force and effect as *Nollan* and *First English Church.* One writer described it as a "low quality" decision. *See* Richard A. Epstein, *Takings: Descent and Resurrection,* 1987 Sup.Ct. Rev. 1, 5–23. Upon the filing of *Lucas* in 1992, it, in the view of many, supplanted *Keystone* in the trilogy.

Supreme Court's position rejecting statutory provisions *further* impinging upon a property owner's rights. 96 Md.App. at 544–55, 625 A.2d 424. The trilogy, especially *Lucas*, in essence said, "No more." The Supreme Court, as we view it, stopped the trend toward the diminution of private property rights through regulatory schemes based upon perceived environmental concerns.[17] *See Florida Rock Indus., Inc. v. United States*, 791 F.2d 893, 900–03 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987); *Collis v. City of Bloomington*, 310 Minn. 5, 246 N.W.2d 19, 26 (1976); *City of College Station v. Turtle Rock Corp.*, 680 S.W.2d 802, 804–06 (Tex.1984); *Call v. City of West Jordan*, 606 P.2d 217 (Utah 1979); *Jordan v. Village of Menomonee Falls*, 28 Wis.2d 608, 137 N.W.2d 442 (1965), *appeal dismissed*, 385 U.S. 4, 87 S.Ct. 36, 17 L.Ed.2d 3 (1966); *see also J.E.D. Assocs. v.*

---

**17.** We acknowledge Judge Williams's learned and well-reasoned comments upon the nature of takings law as impacted by the trilogy of Supreme Court cases we have described. We note that students of the issue and these cases, as Judge Williams obviously is, may differ as to the extent of the impact of the cases. One, of course, must be cautious when adopting the thoughts of those who labor, abstractly, in the field, such as pure academics. Academics are more likely to transform hopes into fact merely by stating them as such. In essence, *Lucas* was the Roberto Duran, "No mas, no mas," of land-use cases.

The Supreme Court has added to the *First English Church, Nollan*, and *Lucas* trilogy what many view as the most important of its modern land-use cases, *Dolan v. City of Tigard*, 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994), which addresses "improper exactions." *Dolan* does that which Professor Roland K. Best, author of *New Constitutional Standards For Land Use Regulation: Portents of Nollan and First Lutheran Church*, Inst. on Planning, Zoning, & Eminent Domain ch. 6 (1988), and apparently the learned trial judge here, perceived to have occurred in the prior trilogy of cases.

Interestingly, Robert C. Wilcox, Administrative Hearing Officer in the case *sub judice*, in March of 1994, prior to the *Dolan v. City of Tigard* opinion, when commenting on the OS classification of this privately-owned property, stated:

The subject property is privately owned. Absent an agreement to the contrary, we doubt if government could compel a private property owner to use that property for community recreational purposes without compensating the property owner.... It would, therefore, be unreasonable to require the property to maintain OS zoning under the circumstances here presented.

*Dolan* removes most, and perhaps all, of the doubt.

*Town of Atkinson,* 121 N.H. 581, 432 A.2d 12, 14 (1981), *overruled in part by Auburn v. McEvoy,* 131 N.H. 383, 553 A.2d 317 (1988); *Jenad, Inc. v. Village of Scarsdale,* 18 N.Y.2d 78, 271 N.Y.S.2d 955, 956–57, 218 N.E.2d 673, 674–75 (1966). *Compare Pioneer Trust & Sav. Bank v. Village of Mount Prospect,* 22 Ill.2d 375, 176 N.E.2d 799, 802 (1961), in which a developer was required to provide school facilities. The court there noted that the need for a new elementary school was not completely attributable to the developer's project. The Illinois Supreme Court noted, " [T]he school problem which allegedly exists here is one which the subdivider should not be obliged to pay the total cost of remedying." 176 N.E.2d at 802.

For purposes of the case *sub judice, First English Church* is an important part of the Supreme Court's trilogy of land-use cases, as it relates to the moratorium aspect of the statutory scheme here addressed. In that case, the church had, for some time, owned land in a California creek basin, which it operated as a retreat and campground, *i.e.,* those types of activities often associated with churches. In 1978, a flood destroyed the church's buildings in the creek basin. Responding to the flood, Los Angeles County adopted an "interim ordinance," that provided, in relevant part:

> A person shall not construct, reconstruct, . . . any building . . . any portion of which is, or will be, located within the outer boundary lines of the interim flood protection area
> . . . .

482 U.S. at 307, 107 S.Ct. at 2381 (quoting County of Los Angeles Ordinance No. 11,855 (1979) ). The church filed suit, claiming, in part, that the ordinance "denies [appellants] all use" of the property, and sought damages for the taking. The trial court, citing a California case, *Agins v. City of Tiburon,* 24 Cal.3d 266, 157 Cal.Rptr. 372, 598 P.2d 25 (1979), *aff'd on other grounds,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), found that the church's case could not be maintained as a case for damages unless there had been a prior declaratory judgment or mandamus action declaring the statute unconsti-

tutional. *See* 482 U.S. at 308–09, 107 S.Ct. at 2382. Because the case was based upon a regulatory taking and sought damages, the California court declined to entertain the taking issue. On appeal, the United States Supreme Court noted that the church was asking it to void the California court's holding that temporary regulatory takings do not require compensation.[18] The Supreme Court noted:

Appellant's [First English Church] complaint alleged that [the ordinance] ". . . denies [it] all use of Lutherglen," [the retreat and camp] and sought damages for this deprivation. . . . [T]he claims were deemed irrelevant solely because of the California court's decision in *Agins* that dam-

---

**18.** Under the California case of *Agins v. City of Tiburon*, 24 Cal.3d 266, 157 Cal.Rptr. 372, 598 P.2d 25 (1979), *aff'd on other grounds*, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), no compensation was required for a temporary regulatory taking. we note that, prior to *First English Church*, it was, in some legal quarters, believed that temporary moratoria of all uses had not generally involved takings issues. In *S.E.W. Friel v. Triangle Oil Co.*, 76 Md. App. 96, 543 A.2d 863 (1988), we noted that factual distinctions might make *First English Church*'s prohibition against temporary takings inapplicable in cases involving normal delays in the building process, but we did not there decide the issue of *First English Church*'s impact upon temporary moratoria. We merely held that temporary suspension of land use during *normal* decision-making might not constitute an unconstitutional taking. The moratorium in the case *sub judice* was perceived to be for at least six years. It is unlikely that the Supreme Court, especially in light of *Nollan, Lucas,* and *Dolan,* would consider a six-year moratorium to be a normal part of the application review process. Moreover, our decision in *S.E.W.*, in light of the subsequent Supreme Court cases mentioned, might, if properly presented, be subject to reconsideration.

In that regard, we note, especially in relation to the adequacy of facilities issue, what the Supreme Court said in *Dolan:*
 Cities have long engaged in the commendable task of land use planning. . . . The city's goals . . . are laudable, but there are outer limits to how this may be done. "A strong public desire to improve the public condition [will not] warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." 512 U.S. at ——, 114 S.Ct. at 2322 (citation omitted).

In *Lucas*, the Supreme Court discussed *First English Church*, and specifically stated, "See generally *First English* . . . (holding that temporary deprivations of use are compensable under the Takings Clause.)" 505 U.S. at 1011–12, 112 S.Ct. at 2891.

ages are unavailable to redress a "temporary" regulatory taking.... [19]

> ... We now turn to the question whether the Just Compensation Clause requires the government to pay for "temporary" regulatory takings.

482 U.S. at 311–13, 107 S.Ct. at 2384–85 (footnotes omitted). After a discussion of its prior cases, primarily those relating to the appropriation of private property by the United States in World War II, the Court answered its question:

> The[ ] cases reflect the fact that "temporary" takings which, as here, deny a landowner all use of his property, are not different in kind from permanent takings, for which the Constitution clearly requires compensation .... It is axiomatic that the Fifth Amendment's just compensation provision is "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." ... Where this burden results from governmental action that amounted to a taking, the Just Compensation Clause ... requires that the government pay the landowner for the value of the use of the land during this period.

*Id.* at 318, 107 S.Ct. at 2388 (citations omitted).

Thus, the (more or less) temporary character of the Anne Arundel County Code's Adequacy of Facilities Ordinance, combined with the zoning ordinance, does not insulate the statutory scheme from constitutional takings analysis. We, as did Judge Williams, must therefore determine whether the statutory scheme denied appellants all economically viable uses of the subject property. *See Nollan, supra; Lucas supra.* We first address certain of the Supreme Court's holdings and statements in *Lucas.*

---

**19.** The period involved in the instant case is six years—when school facilities might be sufficient. *First English Church* does not state how long the "interim" period of the ordinance passed in 1979 was intended to be. It, however, was replaced by a permanent ordinance in 1981, some two years later and six years before the Supreme Court's opinion was rendered.

The Supreme Court in *Lucas* noted that, under the Beachfront Management Act, the South Carolina statute there at issue, "construction of occupiable improvements was flatly prohibited seaward of a line." 505 U.S. at 1009, 112 S.Ct. at 2889. That line was landward of Lucas's property. The statutory scheme at issue in the case *sub judice*, as it applies to appellee's property, results in a prohibition of construction of any *"occupiable "* improvements on the subject tract. Lucas argued at the trial level that, even if the statute were a legitimate exercise of the police power, the complete extinguishment of his right to build on his property entitled him to compensation. The trial court agreed. The South Carolina Supreme Court reversed, opining that, when a property regulation is designed "to prevent serious public harm," no compensation was required. 304 S.C. 376, 404 S.E.2d 895, 899 (1991). The United States Supreme Court noted, in *Lucas*, that the state appellate court dissenters had opined that that which the state court majority asserted were akin to nuisances were not in fact nuisances as the term is commonly used, and, thus, the statutory scheme could not, according to the state court dissenters, "fairly be compared to nuisance abatement." 505 U.S. at 1009–11, 112 S.Ct. at 2890. The *Lucas* majority noted the potentiality for improper appropriation of a land owner's property when states attempt to address perceived public problems statutorily:

> On the other side of the balance, affirmatively supporting a compensation requirement, is the fact that regulations that leave the owner of land without economically beneficial or productive options for its use—typically, as here, by requiring land to be left substantially in its natural state—carry with them heightened risk that private property is being pressed into some form of public service under the guise of mitigating serious public harm.

*Id.* at 1018, 112 S.Ct. at 2894–95. Much the same can be said about the statutory scheme in the case at bar *as applied to property in the OS classification.* The Supreme Court continued with a statement that appears, to us, to be particularly cogent in the case *sub judice:*

We think, in short, that there are good reasons for our frequently expressed belief that when an owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking.

*Id.* at 1019, 112 S.Ct. at 2895 (footnote omitted).

While a strong argument can be made that the statutory scheme here at issue, *i.e.*, the combination of the Adequacy of Facilities Ordinance and the zoning article, is for the common good, that argument, if resolved favorably to the County, does not, under *Lucas*, resolve the matter. Even if it were for the common good, it still may cause an unconstitutional taking if it, as it does in the case *sub judice*, results in the loss of all viable economic uses. While a situation where such adequacy of facility statutes slow growth might be constitutionally permissible,[20] it is not constitutionally permissible where the type of growth reduction occurs at the expense of a property owner's loss of viable economic use of his property. In the unique circumstances of the instant case, that is what resulted.

It is also necessary to point out that the regulatory scheme here evidenced does not involve nuisance abatement. The *Lucas* Court addressed at length that very issue, by discussing the South Carolina appellate court's reasoning in respect to that court's efforts to portray the South Carolina statute as a nuisance abatement measure by its notation that the statute was necessary to "prevent a great public harm." The Supreme Court then noted the South Carolina's court positions that the purposes of the statute brought the case within the ambit of *Mugler v. Kansas*, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887), the nuisance abatement case, and its progeny, *i.e.*, the line of cases including *Goldblatt v. Town of Hempstead*, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962); *Miller v. Schoene*, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928); *Hadacheck v. Sebastian*, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed.

---

**20.** We do not decide that issue here.

348 (1915). The *Lucas* Court acknowledged that many of its opinions had suggested that " 'harmful or noxious' uses of property could be proscribed by government regulation without the requirement of compensation." 505 U.S. at 1022, 112 S.Ct. at 2897. The Court stated:

> One could say that imposing a servitude on Lucas's land is necessary in order to prevent his or it from "harming" South Carolina's ecological resources; or, instead, in order to achieve the "benefits" or an ecological preserve....
>
> When it is understood that "prevention of harmful use" was merely our early formulation of the police power justification necessary to sustain (without compensation) *any* regulatory diminution in value; and that the distinction between regulation that "prevents harmful use" and that which "confers benefits" is difficult, if not impossible, to discern on an objective, value-free basis; it becomes self-evident that noxious-use logic cannot serve as a touchstone to distinguish regulatory "takings"—which require compensation—from regulatory deprivations that do *not* require compensation. *A fortiori* the legislature's recitation of a noxious-use justification cannot be the basis for departing from our categorical rule that total regulatory takings must be compensated.

*Id.* at 1024–26, 112 S.Ct. at 2898–99 (citations and footnotes omitted).

> In the case of land, however, we think the notion pressed by the Council that title is somehow held subject to the "implied limitation" that the State may subsequently eliminate all economically valuable use is inconsistent with the historical compact recorded in the Takings Clause that has become a part of our constitutional culture.
>
> ... We believe similar treatment must be accorded confiscatory regulations, *i.e.*, regulations that prohibit all economically beneficial use of land: Any limitation so severe cannot be newly legislated or decreed (without compensation), but must inhere the title itself, in the restrictions that background principles of the State's law of property and

> nuisance already place upon land ownership. A law ...
> must ... do no more than duplicate the result [achievable]
> ... under the State's law of private nuisance, or ... under
> its ... power to abate [public] nuisances....

*Id.* at 1028–29, 112 S.Ct. at 2900 (citations and footnotes omitted). With the holding of *Lucas* and the trilogy of cases we have discussed in mind, we now analyze the case at bar. We first note appellants' argument that, when the Board dismissed the appeal, the property then became classified as RLD (Residential Low Density), which permitted some economically viable use. We hold that the property was never, and is not now, classified RLD. Before discussing the County's statutory requirements, we shall note some similarity to South Carolina's ripeness argument in *Lucas*.

■ The *Lucas* Court, in respect to a special act passed after the litigation had commenced, noted that the South Carolina Coastal Council contended that that statute could be used by Lucas to apply for a special permit. The Supreme Court responded:

> Lucas had no reason to proceed on a "temporary taking" theory at trial, or even to seek remand for that purpose prior to submission of the case to the South Carolina Supreme Court, since as the Act then read, the taking was unconditional and permanent....
>
> In these circumstances, we think it would not accord with sound process to insist that Lucas pursue the late-created "special permit" procedure before his takings claim can be considered ripe.

*Id.* at 1012, 112 S.Ct. at 2891. Commenting upon the argument of one of the dissenters that Lucas should have dismissed his action or, at least, that it should not have proceeded until he had exhausted the new special permit procedure, the majority noted, "[S]uch a submission would have been pointless, as ... no building permit would have been issued ..., application or no application." *Id.* at 1012 n.3, 112 S.Ct. at 2891 n.3. In the case *sub judice,* at the time appellee applied for rezoning of the subject property, it could not have

been successful in applying for a building permit under an RLD classification, because the subject property was not then classified RLD. Thus, prior to appellee's application, it could not have applied for the uses permitted in that classification. Moreover, as we state elsewhere, the only special exception permitted was for the operation of public utilities. Appellee is not a public utility. Additionally, for reasons we hereafter note, a mistaken zoning classification does not justify the grant of a variance; it permits a rezoning.

 Applications for rezoning, pursuant to Article 28, § 11–104, must specify the proposed zoning classification and must be, pursuant to § 11–103, made by the County or by a person who has at least a ten percent ownership interest in the property sought to be rezoned. The only application before the hearing officer was that filed by appellee and the only proposed classification was R5. The hearing officer was not an owner of the property and there was no proper application before him for RLD. He had the authority to grant or deny that particular application, not some other application not made. We hold that to grant rezoning to a classification not applied for was improper. Moreover, in light of his comments, we hold that the hearing examiner/administrator, when he denied appellee's request for rezoning and purported to grant to appellee an unsought for RLD classification, was attempting to create the new rezoning equivalent of the South Carolina new "special permit" procedure adopted by that state to thwart the constitutional takings resolution. As did the Supreme Court, we do not think it would accord "with sound process" to permit governmental entities, when faced with zoning-generated takings claims, after the issue is met, to grant something not requested in order to be able thereafter to avoid takings consequences, arising out of the statutes as they existed at the time of application. As did the Supreme Court of *Nollan v. California Coastal Comm'n,* 483 U.S. at 841, 107 S.Ct. at 3150, we "view the Fifth Amendment's Property Clause to be more than a pleading requirement, and compliance with it to be more than an exercise in cleverness and imagination."

The Administrative Hearing Officer, when considering the only application before him, appellee's request for R5 zoning, found that the appellee "has no *reasonable* use of the subject property in its current OS zoning classification." That finding was not appealed to the Board. The hearing officer continued and stated, "[I]t is my opinion that the applicant has the constitutional right to a zoning classification which will afford the subject property some reasonable use." The hearing officer then stated that the taking "dilemma" could not be resolved by granting that which was sought. That was clearly error. Nevertheless, rather than, at that point, granting the application or denying it outright, the hearing officer attempted to insulate the County from "taking" problems by granting something not requested, which could be used to argue that reasonable use thereafter existed. Of course, at the hearing officer's implied suggestion, the argument was then made to the circuit court, and then to us. The circuit court based its ruling upon the application presented, not one not made. So do we.

The only action available to the hearing officer, under the relevant circumstances of the present case, was to grant or deny the use requested, and he denied it. That denial (and not some unauthorized grant) was the entire case before the Board. When it dismissed the appeal, appellee's request for rezoning was denied and the property, at that point, remained classified OS.[21] We further note, without deciding, that the attempt to grant an RLD classification, might itself be, as appellee suggests, open to attack by appellants, protestants, or others who would have had standing to protest the RLD classification, because notice requirements might not have

---

21. Our case of *County Council v. Brandywine,* 109 Md.App. 599, 675 A.2d 585 (1996) was **not** a takings case. Moreover, it involved the presumption that a special exception is a type of permitted use; the special exception there granted was the exception applied for; and it resulted in the appeal being dismissed under a time limitation statute when no decisions or findings were made. That situation is inapposite to the case *sub judice.*

been met for that reclassification.[22] RLD zoning permits uses not permitted in R5 that the residents of the surrounding R5 area might find offensive, such as animal husbandry (settling basins for swine excrement can be recognized "by nose" from miles away), dairy farms, furfarming (mink farms are notoriously odorous), private camps (nudist camps?), to name but a few. We have not been made aware, either in written or oral argument, of any provision in the County Code that provides that each higher classification includes all permitted uses in all lower classifications. In some zoning ordinances, the first permitted use in each classification is all the permitted uses in the next lower classification. That language does not appear in the respective classification sections furnished us by the parties. Thus, those opposing an RLD classification, who were not present below or here, might already have had their rights to be heard as to an RLD classification impermissibly compromised.

We next address appellants' argument that, because ".41 developable acres ... are already zoned R–5," there remain economically viable uses by appellee of its property. We note that appellants argue that the trial court did not, in its "legal analysis," consider "whether there is reasonable economic use available [as] it did not address the significance of the .41 acres which are already zoned R–5." The issue was presented to the trial court for its consideration. It found no viable economic uses remaining. Thus, it addressed the issue by resolving it. We suppose appellants' argument is that the trial court should have expressed yard calculations or computations in respect to the four slivers of R–5 property. We do not believe that the trial court is required to express its findings with that degree of specificity. While we are not required to do so either, we shall attempt to see if the trial judge's findings are supportable—based upon the record before him—and before us.

---

22. We have not found in the extract the original application or the notices that might have been made. Neither party asserts that RLD rezoning was sought nor that a notice as to RLD was made.

Appellants, in their brief often refer to the .41 acres in the singular, as if it were one contiguous parcel, when in fact the .41 acres consists of four noncontiguous parcels that, according to the site plan submitted with the rezoning application, are situate as follows: (1) an abutting strip on the north boundary; (2) and (3) two noncontiguous strips abutting on the southwest boundary; and (4) one elongated strip abutting on the southeast boundary.[23] Appellee, in its brief, "extrapolates" from the drawings in evidence the size of the four parcels. We have considered those figures and have compared them with the exhibits in evidence in the record. They appear to be essentially accurate. Moreover, we have made our own independent review of the largest parcel's ability to support a reasonable residential structure.[24]

We address the largest parcel of presently zoned R5 property—that adjacent to the fire station and abutting on Cape St. Claire Road. If a dwelling is sited on that parcel so that its front or rear yards abut the fire station's property, it would have to have a minimum of a twenty-foot setback (rear yard) or twenty-five foot (front yard) or both forty-five feet. In that instance, the side yard would abut on Cape St. Claire Road and it would have to be at least thirty-five feet from that roadway. We have examined the actual full-size plat available to the trial judge and, using the scale on that plat—one inch equals forty feet—have been able to make some approximate measurements. At a point thirty-five to forty feet from Cape St. Claire Road, the lot is approximately fifty feet wide. At that point, a twenty-foot setback from the lot line abutting on the fire station is required. That would leave, at most, a thirty-foot buildable width prior to figuring in the other setbacks. Even if no front yard setback were calculated, that

---

23. See diagram "A" that we have reduced from the actual exhibit before the Court. The four areas are indicated by the round circles with the notation "EX. R5 ZONE ON–SITE" with arrows to the parcels. One such circle has arrows to two parcels.

24. We have shown that parcel as diagram "B". It is also taken from the exhibit in the record. Diagrams "A" and "B" should be reviewed together.

would leave only a twenty-five to thirty-foot wide parcel remaining for building at that specific point—but the lot drastically narrows. In respect to a structure whose side yard is on Cape St. Claire Road, from the point where the northwestern wall of the structure would be, southeastward along the longer aspect of the lot the width of that parcel quickly narrows. About twenty feet further southeasterly, the lot is approximately forty feet wide. Thus, at that point, after subtracting the twenty-foot rear setbacks, there is a twenty-foot building area. Consequently, a twenty-foot long building that might be approximately twenty-five to thirty feet wide on the Cape St. Claire Road side would have to be about twenty feet wide at a point twenty feet into the building. A forty-foot long building could only be about ten to fifteen feet wide at its southeasterly wall. At sixty feet from the Cape St. Claire Road setback line, no structure is permitted. If such a structure required a front *and* rear setback (which we do not decide) from the OS property, the buildable area would be limited to approximately five feet at the most on the Cape St. Claire Road side.

If the structure were to front or rear on Cape St. Claire Road, it would still have to be thirty-five feet from that road, where the parcel, as we have noted, is approximately fifty feet wide. Side yards totaling twenty feet would be required. Thus, at that point, the Cape St. Claire Road front wall of the structure could be perhaps thirty feet wide. The narrowing of the parcel as it proceeds southeasterly would cause the narrowing of such a structure as well. More important, the rear yard of twenty feet (or a front yard of twenty-five feet) would further limit the structure's southeastern extent. That wall would have to be at least twenty feet from the property line that would be curving into, and in front of, the structure. The combination of side yard setbacks and the curving lot line would further constrict the structure.

When the cases discuss viable economic use, they mean reasonable use. The trial judge apparently did not find that such use of this particular tract was viable. We cannot say

that he was wrong, because, based upon our review, we do not perceive that such a strained concept of use is reasonable.

It appears from the plat that, when applying the setback requirements to that largest piece, less than a reasonable buildable width results.[25] The remaining three parcels are smaller and may have an even smaller buildable areas when setback and access requirements are factored in.

■ Upon our review of the four separate parcels of R5-zoned property abutting on the edges of the subject property, we hold that, under the Anne Arundel County Code's zoning regulations, no reasonable economical use can be made of the four noncontiguous tracts. We note that the Administrative Hearing Officer, at the initial stage of this application process, made the exact same finding—a finding never appealed by appellants. We now direct our attention to the effect of the Adequacy of Facilities Ordinance, *i.e.,* Article 26, § 2–416, on the property zoned OS.

We reiterate that, from our examination of the record, as contained in the extract, it is our view that the County's Adequacy of Facilities Ordinance, as incorporated into the Code's zoning regulation, Art. 28, did not contemplate that its enforcement would leave privately owned property unusable for viable economical uses. As we see it and as we have indicated, the ordinance was intended to apply when the owner of property already being used, or available to be used, for residential purposes, sought to increase the degree of residential use—usually by the subdivision process. The statutes' effect might not, under those circumstances, amount to an unconstitutional regulatory taking, because there might remain a viable economic residential use of the property, even if the upzoning were denied as a result of the inadequacy of school facilities. Hence, in many cases, the scheme might be insulated from constitutional attack. In the instant case, how-

---

25. We presume that it is possible to build structures in the shape of a pie slice. We do not, however, perceive that it is reasonable to require that they be so constructed.

ever, an aberration that occurred as a result of the Association's improper assertion of ownership resulted in the mistaken OS zoning of the subject site. We must therefore examine the uses described to us, as being permitted in an OS zone, in order to determine whether they leave viable economic uses to private property owners. In doing so, we are acutely aware that, when the OS classification was created, it was not designed to be imposed upon private property, but upon public property or community (community associations') property.

Earlier, we reiterated the uses stated in Article 28 and Judge Williams's opinion. As we previously noted, neither party has challenged Judge Williams's findings in that regard. The uses that Judge Williams stated were permissible in the OS zone were general recreational uses that preserve the natural environment, conservation uses, structures for the maintenance of the natural environment, farming, or nurseries, nonresidential structures including barns, stables, and kennels, nonprofit camps, and temporary structures for boating, swimming, fishing, hunting, golf courses, ice skating, nature study, picnics, play areas, and the like. Additionally, the hearing officer, Robert Wilcox, as pertinent here, opined that it could be used for a "public beach," "rights of ways," "piers and ramps," and "alcoholic beverage uses as ancillary to permitted uses." As noted earlier, appellants concede that an OS classification "permits no development."

As we have indicated, the uses permitted in OS-zoned districts do not include any viable economic uses—nor were they, as proposed, intended to include viable economical commercial or residential uses, except as accessories to an already existing residential use. There is no existing residential use in the instant case. Additionally, as we have indicated elsewhere, the classification was not generally intended for privately owned property in the first instance, unless that property was community property, intended to be reserved by that community for recreational purposes.

The instant property is neither public nor community property. It is purely private property, irrespective of the wishes

of neighboring property owners. Even the special exception provisions contained in the OS classification are limited to a consideration of public utility structures and uses. Simply stated, the OS classification was not intended to be imposed upon the property at issue in the first instance. The current desires of a plebescite of neighboring owners cannot alter the intended purposes of the classification.

■ Moreover, the area sought to be rezoned was just over three acres in size and was located at the entrance to a development. In fact, it is virtually surrounded by the development that itself apparently contains thousands of lots and units zoned R5—the classification sought by appellee. Across the street, on the only side not surrounded by the development, is a shopping center. Within the general boundaries of the developed area is a fire station that appears to abut on the subject property. Access to the property is restricted. We hold that none of the uses permitted in the OS classification afford to appellee any viable economic use of the subject property that would avoid the impermissible taking of appellee's property without just compensation. In summary, the statutory scheme, which may or may not be constitutional when applied to the types of property to which the zoning classification was intended to apply, permits, in this specific classification aberration, no economically viable use. It is an unconstitutional regulatory taking.[26]

As early as 1950, the Court of Appeals opined, in *Hoffman v. Mayor of Baltimore*, 197 Md. 294, 307, 79 A.2d 367 (1951), involving a less egregious factual situation than the present case, in respect to the existence of a buffer zone between commercial and residential uses, that

> the only tangible reason given in support of the board's minority veto is the establishment of a "buffer" to protect

---

26. We have acknowledged the survival of the *Mugler v. Kansas* line of cases (as indicated in *Lucas*) in respect to nuisance regulation. There is no indication in the record that the requested rezoning in the case *sub judice* involves nuisance principles.

the residences on Maude Avenue. This is no more lawful in original zoning than in re-zoning.

The Court noted, referring to *Chayt v. Maryland Jockey Club,* 179 Md. 390, 395, 18 A.2d 856 (1941):

Property owners in a Residential district cannot create a "no man's land" at the border of their own district by forbidding one property owner in an adjoining district from making any use at all of his property, or any use for which it is "peculiarly suitable". . . .

197 Md. at 301, 79 A.2d 367.

In the case at bar, Judge Williams opined:

A lack in public school facilities is the primary reason recited by the Board for its denial. While the provision of public facilities is a legitimate concern of the County, the burden of providing adequate schools is disproportionately placed upon Cape Corporation when residential use is denied to them while being granted to its neighbors. Most of Cape St. Claire is zoned R5-residential. In effect, the County is mandating a restrictive use on Cape Corporations' property so as to afford neighboring Cape St. Claire residents more enjoyment in their exploitation of the forbidden R5-residential use. The County at-large must bear the burden of providing adequate schools, not the Cape Corporation. See *First English Church,* 482 U.S. 304, 318–319 [, 107 S.Ct. 2378, 2387–88, 96 L.Ed.2d 250] (1987). Denial of Appellant's rezoning request on the basis of public school inadequacy constitutes an unconstitutional taking.

. . . .

. . . While the County's school criteria fulfills a legitimate State objective, the Board has placed a disproportionate burden upon the Cape Corporation in meeting the objective by failing to pay just compensation. For this reason alone, the Board's denial is unconstitutional. *See Nollan v. California Coastal Comm'n,* 483 U.S. 825 [, 107 S.Ct. 3141, 97 L.Ed.2d 677] (1987) (holding that where a public easement is found to "substantially advance" a "legitimate state inter-

est", the State's power of eminent domain must be exercised and just compensation paid). [Footnote omitted.]

Under the circumstances of the instant case, we agree with Judge Williams's conclusion. When the statutory scheme here present, *i.e.,* the Adequacy of Facilities Ordinance combined with the rezoning requirements of the Code's zoning regulations, is used to deny upzoning from a zoning classification that, as applied to a specific property, permits no viable economical uses of the property, the scheme, as applied to that specific property, constitutes an impermissible regulatory taking, *i.e.,* an unconstitutional taking that requires just compensation. As applied to the subject property now zoned OS, the denial based, as it was, solely upon inadequate school facilities was arbitrary and illegal, *i.e.,* unconstitutional. We shall affirm Judge Williams's findings.

Judge Williams did not, and we shall not, extensively address the Board's afterthought musings upon what future problems appellee might have complying with critical area regulations if the rezoning were granted. The Board's *dictum* that a density of five units might not be compatible is just that—*dictum*. The Board's determination was based solely upon the inadequacy of school facilities. Moreover, the Critical Area Commission had no objections to the rezoning. We noted, in *North v. St. Mary's County,* 99 Md. App. 502, 507, 638 A.2d 1175, *cert. denied,* 336 Md. 224, 647 A.2d 444 (1994), that the Critical Area Commission's involvement in local zoning matters was grounded in Maryland Code (1990 Repl. Vol.), § 8–1812(a) of the Natural Resources Article, which confers upon the chairman of the Commission standing to appeal zoning decisions. In the case *sub judice,* not only has Chairman North, and thus the Commission, not appealed Judge Williams's decision, it, at the administrative level, by letter, did not object to the rezoning. We do not address the critical area aspects of the application further because, as the trial court opined, the Board did not base its denial upon the

critical area regulations. Moreover, the actual uses appellee makes, or attempts to make, may yet involve critical area review. If that review raises questions of constitutionality, it may then be subject to judicial review. That issue was not sufficiently raised below, and we shall not raise it here. Md. Rule 8–131(a). We note, as we did in *Offen* and subsequent cases, that the critical area statutory framework was carefully crafted to sustain constitutional attack by reason of its provisions providing, at least as stated, relief. It remains to be seen whether the critical area statutes are being applied in a constitutional manner. That issue, however, is best left for a different case.

We would be remiss if we did not note that our holding, *i.e.*, that the statutory scheme, *as applied in the instant case, where the existing zoning is OS,* is unconstitutional, is limited to the instant case. We hold that, when applied as it was here, to OS-zoned private property with no existing residential uses, it is unconstitutional. In other cases involving other classifications, existing uses, or other circumstances, the same statutory scheme may or may not be constitutional. We perceive that, if the present zoning of a subject property is other than OS and permits some viable residential or reasonable commercial use, the statutory scheme as applied to those types of properties may withstand "takings" scrutiny.

In the present case, it does not.

We conclude by noting what the Supreme Court said in *Dolan:*

We see no reason why the Takings Clause of the Fifth Amendment, as much a part of the Bill of Rights as the First Amendment or Fourth Amendment, should be relegated to the status of a poor relation in these comparable circumstances.

512 U.S. at ——, 114 S.Ct. at 2320.

## JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANTS.[27]

---

**27.** Appellants argue that appellee has not exhausted administrative remedies, *i.e.*, sought a permit or special exception. A property owner is not required, under exhaustion theories, to apply for a permit that is prohibited. Additionally, appellee's option to apply for a special exception is limited to an application to operate a public utility or to apply for a permit that he cannot get. In respect to variance law, the only thing unique about this property is its zoning classification. The evidence indicates that, but for that classification, it would be buildable. Neither the courts of this State, nor, as far as we know, the courts of other states, have held that a mistaken zoning classification satisfies the first prong *analysis* of the variance process. For obvious reasons, the problems caused by mistaken zoning classification are intended to be addressed by correcting the classification—not the obtention of variances from it based upon the mistake.

A property owner is not required to exhaust futility in order to respond to an exhaustion of remedies argument. In any event, the inadequacy of school facilities statute would prohibit the issuance of any permits, exceptions, or variances. (We note, additionally, that the granting of variances are rarely upheld.) *See Cromwell v. Ward,* 102 Md.App. 691, 651 A.2d 424 (1995).