708 A.2d 1093

**Anne Marie WHITE, et al.**

**v.**

**John C. NORTH, II, Chairman.**

**No. 981, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

April 30, 1998.

198

William M. Simmons (Karl A. Phillips, on the brief), Annapolis, for appellants.

Marianne D. Mason, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Annapolis, for appellee.

Argued before MURPHY, C.J., and HARRELL and THIEME, JJ.

HARRELL, Judge.

Anne Marie and Richard D. White, III, appellants, seek restoration of an area variance to construct a swimming pool adjacent to their home in Annapolis that had been granted by the County Board of Appeals of Anne Arundel County (the Board), only to be snatched away by the Circuit Court for Anne Arundel County (Robert H. Heller, Jr., J.) based on a petition for judicial review filed by John C. North, II, Chair, Chesapeake Bay Critical Area Commission, appellee.[1] We shall affirm the circuit court's judgment.

---

1. The Chair's standing to maintain such a petition, established at Maryland Code (1974, 1990 Repl.Vol., 1997 Supp.), § 8–1812(a) of the Natural Resources Article, was fully explored by this Court in *North v.*

Although appellants frame two questions on appeal, we have condensed them into the following question:

If there was substantial evidence before the Board to support its findings as to each of the ordinance requirements for the grant of the variance, was it arbitrary and capricious for the circuit court to substitute its judgment for that of the Board?

### *The Factual Record and Legal Background*

Apparently sometime in 1996[2] appellants applied for certain variances to enable them to construct decks[3] on their existing house at 1913 Martins Cove Court in Annapolis and a swimming pool in the rear yard of the 1.52 acre lot. The apparent variances sought were from the requirements of Anne Arundel County Code 1993, Article 28, Section 1A–104(a)(1) and (c)(11):[4]

### § 1A–104. Plan requirements.

(a) All development plans in the critical area shall contain notations of the following criteria that shall be a condition of development on the property:

*(1) There shall be a minimum 100-foot buffer landward from the mean high-water line of tidal waters,*

---

*St. Mary's County,* 99 Md.App. 502, 506–09, 638 A.2d 1175, *cert. denied,* 336 Md. 224, 647 A.2d 444 (1994).

**2.** The record does not disclose exactly when the application for the variances was filed. We infer that it was filed in 1996 from the case number assigned by the Board, BA 47–96V.

**3.** The variance relative to the proposed decks was approved by the Board without opposition, and thus was not part of the subsequent legal challenges.

**4.** The record does not contain a copy of the variance application filed by appellants, in which one would expect to find the identity of the specific ordinance requirements for which relief was requested. Furthermore, the written "Memorandum of Opinion" of the Board majority that granted the variances does not recite exactly what sections of the Anne Arundel County Code contain the requirements for which the Board was granting relief via the variances. We have inferred the County Code sections recited above from our gleaning of the briefs.

*tributary streams, and tidal wetlands. The buffer shall be expanded . . . to include any contiguous, sensitive areas such as steep slopes . . . and shall include all land within 50 feet of the top of the bank of steep slopes.* There shall be a minimum 25–foot buffer surrounding all nontidal wetlands;

\* \* \* \* \*

(c) Within limited development areas and resource conservation areas the following additional criteria shall apply:

\* \* \* \* \*

*(12) Within limited development areas, new development activities are not permitted in the buffer except water-dependent facilities[.]*

The parties do not contest the fact that appellants' lot, to a substantial degree, and the proposed pool site, in particular, presently fall within the designation of a limited development area (LDA) and the extended critical area buffer for purposes of Maryland Code (1974, 1990 Repl.Vol., 1997 Supp.), Natural Resources Article, §§ 8–1801 to 8–1813 ("Chesapeake Bay Critical Area Protection Program"); Title 27 of COMAR ("Chesapeake Bay Critical Area Commission"); and Articles 28 ("Zoning") and 26 ("Subdivision") of the Anne Arundel County Code. The parties also do not dispute that the proposed swimming pool, for purposes of applicable critical areas laws and regulations, constitutes an "impervious area" [5] and is not a "water-dependent facility." [6] Thus, the effect of the

---

**5.** "Impervious area," as understood by one of appellants' witnesses before the Board, generally means an area inimical or obstructive to water draining through it, i.e. a concrete or similarly paved surface.

**6.** *See* COMAR 27.01.03.01(A) and (B):

Title 27
CHESAPEAKE BAY CRITICAL AREA COMMISSION
Subtitle 01 CRITERIA FOR LOCAL CRITICAL AREA PROGRAM DE-
VELOPMENT

\* \* \* \* \*

Chapter 03 Water–Dependent Facilities
.01 Definition.

critical areas regulatory scheme is to prohibit the construction of the pool within the extended critical area buffer unless a variance is obtained. The Whites suggest that the origin of their problem is the nonserendipitous timing of the full legal effective of the critical areas regulatory scheme vis à vis the Whites' intended development of their lot.

The Whites purchased their previously subdivided lot (Lot 16, Martin's Cove Farm subdivision) in 1983. Ms. White testified at the Board's 9 September 1996 variance hearing that she and Mr. White "spent several years planning the house." Although apparently aided by various professionals, such as Mr. Daniel J. Werner, a registered professional engineer with Anarex, Inc., Ms. White stated she and Mr. White "drew the plans ourselves and submitted them ourselves"[7] and "began initial construction, lot clearing, and so forth in 1987." Construction of their home, however, did not begin until 1990.

During the "lot clearing" phase, the Whites not only "cleared the site," but performed site grading. The site grading included excavation of the home site and deposit of the excavated and disturbed earth elsewhere on the lot. Ms. White testified, with regard to the site grading, that "[i]t was a gradual slope [referring to the pre-grading conditions on the lot], but it wasn't —this 15 percent slope is created by the excavation."

A. "Water-dependent facilities" means those structures or works associated with industrial, maritime, recreational, educational, or fisheries activities that require location at or near the shoreline within the Buffer specified in COMAR 27.01.09.

B. An activity is water-dependent if it cannot exist outside the Buffer and is dependent on the water by reason of the intrinsic nature of its operation. These activities include, but are not limited to, ports, the intake and outfall structures of power plants, water-use industries, marinas and other boat docking structures, public beaches, and other public water-oriented recreation areas, and fisheries activities.

7. Mr. Werner testified "the house was originally designed ... by our firm."

Mr. Werner, testifying before the Board as part of appellants' case, stated with regard to the effect and extent of the site grading that preceded the commencement of house construction that

the whole site is created, by the way. It's completely cleared.... And the soils around the house and in the disturbed area were changed during the construction of the house.

Thus, the area where the pool was proposed ultimately was "disturbed [built-up] and created by the grading [for] the house."

Describing the soil that existed on the lot in its pre-graded state, Mr. Werner referred to it as a "Esboro loamy sand," generally with a clay layer somewhere beneath. In the course of the grading activity, however, sandy clay soil became the dominant soil in the area where the pool is proposed now. Moreover, the redistribution of earth created a steeper slope than had previously existed in the same area. Mr. Werner described the pre-grading soil condition as "more permeable" than the "relatively impervious" post-grading condition.[8]

Ms. White stated that she and Mr. White had intended from the beginning of their house planning efforts to include tiers of decking on the exterior of the home and a swimming pool at some undefined location on the lot. Although some decking was shown on the approved home construction plan, no decking was actually constructed at that time. No swimming pool was depicted on any house or site plan submitted by the Whites at that time. Ms. White attributed this omission from the 1990 house plans to "probably just an oversight."[9] Explaining why she now wanted to construct a pool, she stated:

---

8. There is no evidentiary basis in the record from which a comparison can be made of the vegetive cover, if any, that may have existed on Lot 16 in its pre-graded condition versus what remained after, or came into existence subsequent to, site grading.

9. As noted earlier, Mrs. White previously explained that her intentions during the planning process for the house, had been to build a pool "at a future date."

[T]o enjoy it. Several of my friends have pools on water-front properties.[10] And, since we're not even near the waterfront, I never anticipated this to be such an issue.

I have a youngster who is interested in swimming, as— just as a course of relaxation and enjoyment, and just as part of enjoying my house.

When the Whites ultimately decided it was time to build a swimming pool, they claim to have discovered for the first time that the critical areas regulatory scheme, at both the State and Anne Arundel County levels, existed and was fully effective.[11] This regulatory scheme, as noted earlier in this opinion, proclaimed an extended buffer of at least 50 feet from the top of steep slopes (defined as 15% or greater) that lead to the primary 100 foot buffer adjacent to any watershed that drains to the Chesapeake Bay. Within this extended buffer, non-water dependent impervious structures are prohibited.

The proposed pool, 546 square feet in area, was sized by the Whites, on advice of their pool contractor, because it was the smallest pool that could safely accommodate a diving board. Ms. White indicated a willingness to reduce the size of the

---

10. The record is silent as to where the "friends who have pools on waterfront properties" reside relative to the Whites' nonwaterfront lot or any other point of reference. Of similar vagueness, Ms. White, at another point in her testimony, claimed there were "at least four other pools in the neighborhood." No effort was made, however, to define on the record the "neighborhood," whether these pools were constructed in an LDA, extended critical area buffer, or, if so constructed, whether they were constructed before imposition of the critical areas regulatory scheme or thereafter by virtue of a variance. Later testimony from witnesses in opposition to the variance suggested the latter possibility was unlikely in any event.

11. The creating legislation at the State level was enacted in 1984. The State's implementation criteria were approved in 1986, and became effective as of 13 May 1986. The adoption and approval of the County's implementation program occurred in May 1988. Appellants imply they did not learn of the effect of these laws and regulations on their lot until they applied for a pool permit, apparently sometime in the latter part of 1995. Appellants, inferentially, and Mr. Werner, directly, asserted that the extended critical area buffers requirement in Anne Arundel County was not in effect when construction commenced in 1990 on the Whites' home. They appear to be mistaken in this regard.

pool to 400 square feet ("about the smallest that they're [the contractor] accustomed to building") and forego the diving board.

With regard to why the proposed pool was sited in the rear yard (south) of their home, Ms. White stated there was no other part of the lot where it could be placed. Evaluating the alternatives, she opined:

I cannot put it in my front yard because of the covenants in our community.[12] And, from aesthetic points of view, I don't think I'd want it there.

To the east side of the house is another slope, which is even greater than the one in the back. And it's wooded on that side, and it's currently a drainage [area] anyway. So I don't think I'd want to put it in the drainage.

The back side of the house is really the only place that would accommodate it, and that's where it was intended.

Upon closer oral examination by a member of the Board, Ms. White offered the following elaboration regarding an east side alternative pool location:

Q. In looking at the [variance] site plan, is there any reason as to why the pool could not be located to the east side of your house where it says "railroad tie wall approximately two feet high"? In that area?

A. Well, the purpose of that railroad tie wall was to retain a slope that's even greater than the one we're talking about in the back.

And then there's about an area about the width of a car—maybe not even—the width of a tractor, I guess—that's level, and then it drops off again down to the bottom of the ditch. So it's quite a significant slope on that side.

Q. So you're saying the slope is greater on the side?

A. The slope is greater on that side of the house than it is in the back.

---

12. The covenants were not offered in evidence before the Board and, consequently, neither we, the circuit court, nor the Board have any basis to evaluate this assertion.

Another Board member focused Ms. White on the site conditions to the west of the existing house:

Q. Ms. White, I have a couple questions. I'm looking at the site plan once again. I notice there are some—there is an existing carport [adjoining the house on its western side]?

A. That's correct.

Q. And also a garage [adjoining the carport to the west]. And is that a concrete slab next to it [further to the west]?

A. Yes.

Q. Does that represent relatively a level area there? Are they located there right now?

A. Yes.

Q. Is that relatively a level area in that spot?

A. It's level—the back side of the garage apron drops off, and the back side of the garage drops off. I mean, those— it's a steeper grade over there than it is behind the house.

Q. So you have a—between your house and your garage is an existing carport with noting overhead?

A. A roof.

Q. There is a roof over top your carport?

A. Right.

Q. Just an open roof? And there's—and the house and a garage, and there's nothing in the front or the back of it?

A. Right.

Q. Then on the opposite side of your garage, there's a concrete slab.[13] Is there anything—is there an overhead structure there too?

A. No.

Turning his attention to an area of the lot east of the primary septic system drainage field (which is located north-

---

13. The open concrete slab, adjoining and west of the garage, is approximately 30 feet by 30 feet square (900 square feet), about half of which appears to be located within the extended critical area buffer. One of the opposition witnesses described this structure as a "patio."

east of the front elevation of the house) and apparently west and outside of a line drawn on the variance site plan delineating the limits of "Expanded Buffer In The Critical Area," [14] the Board member and Ms. White explored that possible alternate site for a pool:

Q. Back, I guess, on the northern end of your site plan, where it says "initial systems," it would be next to the— probably your draining systems. You see the circular area there, where it says "initial systems" . . . I guess it would be the front side of your property? It's circular? Is that your property there? See where you have the existing fields for your septic system? And right next to it it says "initial systems"?

A. Oh, "initial." Yes, I see.

Q. See where it says "expanded buffer in the critical area"?

A. Yes, I see.

Q. To the left of that, it says "Initial systems."

A. Yes.

Q. It seems to be an area there that seems relatively flat, or a two-foot drop; is that correct?

A. Yes.

Q. What is it? Is it a heavily treed area? What is in there?

A. No. It's open. That's [part of] the front yard.

Q. That's the front yard. All right. And then your driveway is on the opposite end?

A. The driveway comes in, right, from the left [northwest] on the plan. When you approach the house, you see the garage first.

---

14. The line delineating the expanded critical area buffer on lot 16 did not extend completely to the northerly or westerly boundaries of the lot. There could be some doubt, therefore, whether the area being scrutinized in this colloquy is in fact outside the buffer.

Q. Okay. And do you see this front yard area from the road that you described as the front yard area, where it says "initial systems"?

A. Right. From the lane, you see it. You don't see it from the cul-de-sac.[15]

Q. What lane do you see it from?

A. This private lane that serves these three properties.

Q. Okay. But you don't see it from the cul-de-sac.

A. That's correct.

Q. And that's relatively a flat area?

A. It's not really flat. We don't have any—there is nothing flat on the entire lot except where the house is, where it was made flat.

Q. Then these contours are incorrect? I mean it certainly shows a two-foot—as flat as this property is required to be—

A. It's about as flat as—it's about as flat as it gets right there in front of the house.

Q. Okay.

A. And I built that up a lot to make it flatter.

Following Ms. White's testimony before the Board, her pool contractor, Mr. Larry Hyland of O'Neil Swimming Pools, testified.[16] He initially described how the pool would be constructed where proposed:

We actually cut into the slope and use a steel and reinforced concrete method. And the back side of the pool would actually be out of the ground. And I would assume that the wooden deck would go on that side of the pool.

---

15. Lot 16 is a pan-handle, or pipe-stem, lot that obtains its vehicular access off a cul-de-sac (presumably a dedicated public road), along with apparently two other lots, via a relatively long 40 foot wide private right-of-way (within which is a 20 foot wide paved driveway).

16. Mr. Hyland had been in the swimming pool business for 9 years at the point in time he testified.

Asked if he meant that he would be excavating into the side of the hill in order to install the pool, leaving the downslope side of the pool exposed, Mr. Hyland theorized:

Well, it really depends on the depth and the grade there. It may have to go below grade. But, in a lot of cases, it's— you cut into the hill. And the bottom of the pool has to be supported on virgin ground, and the back side can be freestanding.

Mr. Hyland next expressed his view of the environmental benefits of installing the pool in the location proposed. Although he never quantified his conclusion, Mr. Hyland maintained generally that the pool would act as a catch-basin for rainwater that fell on its surface area. Evaporation would follow.[17] Thus, the amount of rainwater intercepted by the pool would not be available for surface runoff down the existing steep slope and inferentially would not contribute to the erosion potential of the soils on the slope. Mr. Hyland described the vegetative cover on the slope as "low grass and weeds." [18]

He also was of the opinion that the reinforced concrete pool would stabilize the area somewhat, "creating a level area which is now a sloped area." This too, he opined, could affect beneficially any erosion potential of the slope in the expanded critical area buffer.

The Board explored with Mr. Hyland, as it did with Ms. White, possible alternative sites for the proposed pool. Although Mr. Hyland conceded that a swimming pool (but not

17. Mr. Hyland indicated that the Whites' pool would have 4 inches of free-board, i.e., the intended water level of the pool was not to be higher than 4 inches from the top. Thus, it would take a minimum of 4 inches of rainfall for the pool to overflow, an event he found unlikely.

18. Ms. White earlier described the vegetation on the slope in the area of the proposed pool site as "nothing but weeds" that she and Mr. White mow. The photographs put into evidence by appellants appear to have been taken well after the most recent mowing, given the height of the "weeds." Yet, Ms. White also contended that the "hard clay type dirt" there, which "water does not penetrate," prevented or made difficult growing "anything."

explicitly one the same as proposed in Ms. White's testimony) "could be constructed almost any place" on the property, he specifically identified two areas where he believed a pool could be installed without interfering with steep slopes—the front yard and the "30 by 30 area" (referring to the concrete slab/patio west of the garage).

Appellants' final witness was Mr. Werner, their professional engineer. He explained that initially when his firm designed the layout of the lot for the house location and other improvements (pre–1990) it had proposed siting the home 35–40 feet "closer to the front of the lot." Due to Health Department recommendations for where the septic system should be located, however, the house location had to be moved "further down the slope." Responding to appellants' counsel's leading question, Mr. Werner agreed with the contention that this movement of the house location "puts the pool in an area where it *must* be in the expanded buffer."

Although commenting that steep slopes, and particularly those where soils are relatively impervious, typically lead to stormwater run-off problems and attendant soil erosion, Mr. Werner also testified that the steep slopes on the Whites' property where the pool was proposed contained "no evidence of any erosion taking place," despite the "sparse vegetation" on the slope. In sum, he did not "see any problem with the steep slope as it was." Moreover, the pool, he thought, would have no effect, positively or negatively, on the stability of the slope. Mr. Werner opined (in response to the Board's questions) that, with "fertilization and lime and stuff like that," grass could be grown and that such additional ground cover would "improve the run-off situation that's currently existing."

Ms. Lisa Herger, an environmental specialist with the Chesapeake Bay Critical Area Commission (Commission), presented to the Board the Commission's opposition to the grant of a variance for the pool. Purportedly responding to the criteria for the grant of a variance as expressed in the County Zoning Ordinance, § 2–107, Ms. Herger explained:

a. the Whites' lot is "very typical of lots that were platted and created prior to the adoption of not only the State critical area law and criteria but the County's, which was adopted in '88;"

b. "[t]here [are] other property owners who also have properties very similar to this one. They're very steeply sloped. They're in the LDA. It's not untypical to see this type of lot, since they were platted prior to the adoption of critical area rights;"

c. "those owners—if they have a pool, it was because it was existing prior to the critical area law;"

d. "other applicants similarly situated would not be allowed a pool in the expanded buffer;" and

e. "the ... Commission [created] the expanded buffer ... because it recognizes sensitive areas. In this case, we have steep slopes. The addition of any new impervious area would adversely affect its functioning, not only for water quality ... but also for the habitat that it's provided for." [19]

Additionally, Ms. Herger reasoned that denying the Whites the ability to build their pool within the expanded buffer would not result in the imposition on the Whites of an "unwarranted hardship," within the meaning of the Ordinance criteria, because the Whites already enjoyed a reasonable use of their property—the dwelling located on it. The pool, she explained, was merely an accessory structure or recreational amenity.

Ms. Herger perceived a difference between the "unnecessary hardship" standard for granting an area variance outside the critical areas and the "unwarranted hardship" criterion required to be found in order to grant the same variance from

---

19. Under cross-examination by appellants' counsel, Ms. Herger explained that the two purposes served by the buffer conceptually are to protect water quality in the receiving water bodies by controlling storm water runoff problems, such as erosion, and to protect the habitat. She conceded there were no trees or shrubs in the immediate area of the pool site, only "some grass, some dirt," and that a pool acts as a catch-basin for rainfall to some degree.

a critical areas buffer prohibition. She described the former to be "a little bit easier burden to get over."

The final witness before the Board was Ms. Patricia Miley, a planner with the Department of Planning and Code Enforcement for Anne Arundel County. Ms. Miley related that her agency questioned "the inherent hardship in this request [as to the pool]. Not only is the pool proposed in the expanded buffer, it's also proposed on steep slopes. We find this to be unacceptable." The documentary evidence and other testimony of Ms. Miley was consistent with that of Ms. Herger. Appellants' cross-examination of Ms. Miley adduced that the County "has always opposed the construction of a pool within the buffer," without exception.

We repeat here substantial portions of appellants' closing arguments, not merely because it contains the best explanation of their theory of their case, but because it will illuminate perhaps what led the Board majority to the decision it made:

[W]hat a variance is all about is looking to see whether the property that we're interested in and the requests being made is, in fact, unique.

\* \* \* \* \*

And the uniqueness comes from two different issues. One is whether there is some form of unique hardship, and whether or not the property itself or the request that's being made is unique in that it doesn't really affect or act as a detriment to the things that were being attempted to be protected by the statute.

\* \* \* \* \*

The Whites were going to build a house. And, due to the county's reconfiguration of the location of the house, the house was pushed back in such a fashion that because of the covenants on the property, which preclude location of a pool in the front yard, the steep slopes around the property, and the expanded buffer, which was imposed later, there's no place now to put a pool.

Now a pool is not an atypical amenity that goes with houses of this type.

\* \* \* \* \*

And to deny people typical amenities is to deny these people the typical privileges that come with having a house of this type.

\* \* \* \* \*

And what's unique about this property and why other properties have pools when this one does not is that the location of this house as placed by the county at a time when there was no buffer or expanded buffer law has put this property in a spot where had it been located differently—and it may well have been located differently had everyone known this buffer exemption was coming—they could have had a pool. They might very well have had a pool.

But now, because of the imposition of the buffer law after the house was constructed, this house is denied a privilege that is generally available to houses located in a limited development area.

The peculiar thing on this house is the steep slopes and the way in which the house is located.

\* \* \* \* \*

Therein lies the hardship. It is the imposition of the law after the house was begun, the construction was begun, the location of the house was set, and the cost and the ability to relocate the pool becomes basically a non-possibility, that a hardship is imposed on this property owner.

\* \* \* \* \*

[T]aking the pool away does preclude this individual from enjoying some of the things that are generally available to people even in a limited development area. In this particular case, they don't—can't enjoy it because they cannot locate the pool in a normal spot.

Now, a couple of possibilities arose where you could tear up the carport, or you could maybe fit it on the pad. The pad, as you'll note, is within the expanded buffer, so you'll probably be limited there. You begin to get into the question of whether or not you're in the front yard, so there may be covenant problems.

\* \* \* \* \*

One of the other comments is the quote, "Is the question deniable of reasonable use?" And I recognize that maybe a pool isn't always necessary, but it's certainly a reasonable use of the property.

Is this particular case, the question is wouldn't it be a denial of reasonable use? Yes. There's nothing that should preclude them from having a pool. There's nothing in the law that precludes it, as long as you find that there are some unique circumstances in this case that makes this different from the average one.

Thereafter, a majority (three) of the Board members hearing the case adopted written findings of fact and conclusions of law granting the variance to construct a 400 square foot pool within the expanded critical areas buffer. A two member minority of the Board filed a written explanation of the reasons they concluded the variance should have been denied.

The Board majority, in its 14 November 1996 written decision, made the following findings of fact and conclusions:

The Board finds that unique physical conditions exist on the property. This property is steeply sloped and wooded. The lot is also an irregularly shaped parcel with a pipestem driveway located significantly within the expanded buffer to the critical area. The septic system consumes the bulk of the front yard which is the only flat area of the parcel. The location of the septic system forced construction of the existing residence towards the rear of the lot into the area of the steep slopes. The steep slopes allow at-grade access to the main floor from the front yard, but the main floor becomes a second story at the rear of the house. Although there are doors to provide rear safety access to the main floor, there is no decking or steps to allow the occupants to exist safely. The at-grade exit to the rear of the house is dirt and similarly does not provide proper safe access. The steep slopes in the rear yard appear difficult to stabilize and would be enhanced by the construction of the proposed retaining wall. As a result of these unique physical condi-

tions, there is no reasonable possibility of developing the lot as proposed without a variance to the Code requirements.

The testimony of one of the Petitioners indicates that the proposed swimming pool is small. The record reflects that several homes in the neighborhood have swimming pools. The proposed swimming pool would not be visible from most properties in the neighborhood due to the pipestem shape of the lot, the dense woods and its location to the rear of the house. The Board noted that many homes in the neighborhood are improved with decks and retaining walls. As a result, the Board concludes that the granting of a variance will not alter the essential character of the neighborhood or district in which the lot is located, will not substantially impair the appropriate use or development of adjacent property, and will not be detrimental to the public welfare. The decking proposed is modest in depth and is attached to the house. Because the pool cannot be moved to the front of the property as a result of the septic system, restrictive covenants and tree cover and cannot be moved closer to the house because of the location of the deck access, the Board concludes that the variance granted is the minimum necessary to afford relief.

The property is located within the critical area, therefore, consideration of environmental impacts is essential. Because of the severe location restrictions and the lack of safety access to the rear of the main floor, insufficient access at grade to the rear of the house and inability to place a pool in the rear yard, the Board concludes that the features of this property would cause a strict implementation of the critical area program to result in an unwarranted hardship. The Board finds that the swimming pool would not negatively impact the critical area because it acts as a catch basin for stormwater. Thus, the run-off on the steep slopes will be lessened and the slopes stabilized by the concrete. The water in the pool can freely evaporate and recharge the hydrology of the ecosystem, but will not cause erosion and siltation into the critical area. The retaining wall will assist in slope stabilization and the pervious deck-

ing will decrease erosion from pedestrian traffic. As a literal interpretation of the relevant COMAR and County Code provisions would prohibit the Petitioners from constructing decks, a retaining wall and a pool as their neighbors have, the Board concludes that such an interpretation would deprive the Petitioners of rights commonly enjoyed by other property owners in the area, and within the critical area. For the same reason, the granting of this variance will not confer on the Petitioners any special privilege that otherwise would be denied.

The lot conditions that cause the unwarranted hardship were not created by the Petitioners. Therefore, the request for the variance is not based on conditions or circumstances that are the result of actions by the Petitioners. Likewise, the variance request does not arise from any condition relating to land or building use on any neighboring properties.

Through the action of the pool, eliminating run-off and erosion, and the retaining wall stabilizing the grade and the pervious decking decreasing pedestrian erosion, the Petitioners will actually improve water quality. Such improvements is clearly consistent with the County's critical area program. Accordingly, the Board concludes that the granting of this variance will not adversely affect water quality and will be in harmony with the general spirit and intent of the critical area program. Finally, testimony indicated that the pool will be constructed on an open lawn with mowed weeds and grass. Therefore, there is negligible habitat. Thus, the Board concludes that the proposed variance will not adversely affect fish, wildlife, or plant habitat.

The two dissenting members of the Board filed the following written opinion appended to the majority decision:

We respectfully dissent from the opinion of the majority and would deny the requested variance to allow the construction of an in-ground swimming pool within the expanded buffer. We believe that the evidence does not establish the existence of a hardship. Here, the evidence simply is that the Petitioners would like to have a pool for recreation

in their rear yard. Not having one, however, is not an unwarranted hardship. In *North v. St. Mary's County,* 99 Md.App. 502, 638 A.2d 1175 (1994), the Court of Special Appeals held that a property owner's desire to construct a gazebo in his front yard so that he could read, contemplate and observe the creed did not constitute evidence of an unwarranted hardship. Such is the case here, as well. We believe that the subject property already is fully developed with an attractive single family dwelling. Thus, we find that no unique physical conditions, exceptional topographical conditions, or exceptional circumstances exist that preclude the development of the lot. The lot is already developed.

We find that the pool could be constructed elsewhere on the lot. The Petitioners' pool company witness testified that he could also place the pool to the east or west of the house or in the location of the existing carport. Thus, the pool would not require a variance to the critical area buffer standards, but for Petitioners' desire to have a pool in their rear yard. Locating the pool in the critical area when other options are available is not in harmony with the general spirit and intent of the critical area legislation to avoid impact to this sensitive area. Additionally, requesting a variance where one is not necessary cannot serve as a basis whereby the Board concludes that the variance is the minimum necessary to afford relief.

We most seriously disagree, however, with the majority's apparent determination that the proposed pool is beyond the application of the law. Assuming, for the sake of argument, that the pool is not an impervious surface, the construction of a pool remains a new development activity within the critical area. Such new development activities are simply not allowed. *See, e.g.,* Anne Arundel County Code, Article 28, Sections 1A–104(c)(13), 1A–105(f). We find, however, that the pool is clearly an impervious surface. Indeed, Petitioners' pool company and professional engineering witnesses both confirmed that this pool (and any pool) is an impervious surface. No witness testified that the pool is a pervious surface.

We would conclude that the Petitioners have not met all of the requirements for a variance, and would deny the request to allow the construction of a pool.

We concur, however, with the decision of the majority to the extent that it pertains to the variance to allow the construction of two decks, retaining wall and patio so long as they are constructed of wood.

The Chair of the Commission filed in the circuit court a timely petition for judicial review of the Board's decision. After considering the parties' legal memoranda and oral arguments, the court filed on 6 May 1997 a Memorandum Opinion and Order reversing the Board's grant of the variance(s) for the swimming pool. The court concluded that the Board's decision was not supported by substantial evidence regarding all of the ordinance requirements. In particular, the court's perusal of the record led it to conclude that the finding of unwarranted hardship was not justified by the necessary quantum of evidence, that the Board had misconstrued the law as to whether depriving the Whites from having a pool in the expanded buffer would amount to the denial of a right commonly enjoyed by others, and that granting the variance(s) to the Whites would not confer to them a special privilege not afforded to other property owners.

The Whites filed this timely appeal from the circuit court's judgment.

## STANDARD OF REVIEW

Our role in reviewing an administrative decision "is precisely the same as that of the circuit court." *Department of Health & Mental Hygiene v. Shrieves*, 100 Md.App. 283, 303–04, 641 A.2d 899 (1994) (citing *Baltimore Lutheran High Sch. Ass'n v. Employment Security Admin.*, 302 Md. 649, 662, 490 A.2d 701 (1985)); *see also, Anderson v. Department of Pub. Safety*, 330 Md. 187, 212, 623 A.2d 198 (1993). This means we must review the administrative decision itself. *Public Serv. Comm'n v. Baltimore Gas & Elec. Co.*, 273 Md. 357, 362, 329 A.2d 691 (1974); *State Admin. Bd. of Election*

*Laws v. Billhimer,* 72 Md.App. 578, 586, 531 A.2d 1298 (1987), *rev'd on other grounds,* 314 Md. 46, 548 A.2d 819 (1988), *accord Department of Econ. & Employment Dev. v. Hager,* 96 Md.App. 362, 369–70, 625 A.2d 342 (1993).

In its judicial review of an agency's action, a court may not uphold an agency decision unless it is sustainable on the agency's actual findings and for reasons advanced by the agency in support of its decision. *United Steelworkers of Am. Local 2610 v. Bethlehem Steel,* 298 Md. 665, 679, 472 A.2d 62 (1984). In reviewing the decisions of administrative agencies, the court must accept the agency's findings of fact when such findings are supported by substantial evidence in the record. *See Baltimore Lutheran,* 302 Md. at 662, 490 A.2d 701.

In assessing whether the Board's decision is supported by substantial evidence, we apply the rule that substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State Admin. Bd.,* 314 Md. at 58, 548 A.2d 819 (quoting *Supervisor v. Group Health Ass'n,* 308 Md. 151, 159, 517 A.2d 1076 (1986)); *Bulluck v. Pelham Wood Apts.,* 283 Md. 505, 512–13, 390 A.2d 1119 (1978). In other words, the scope of review "is limited 'to whether a reasoning mind could have reached the factual conclusion the agency reached'." *Bulluck,* 283 Md. at 512, 390 A.2d 1119 (quoting *Dickinson–Tidewater v. Supervisor,* 273 Md. 245, 256, 329 A.2d 18 (1974)).

We must review the agency's decision in a light most favorable to the agency, since "decisions of administrative agencies are *prima facie* correct." *Bulluck,* 283 Md. at 513, 390 A.2d 1119. In applying the substantial evidence test, we do not substitute our judgment for the expertise of the agency, *see State Admin. Bd.,* 314 Md. at 58, 548 A.2d 819, for the test is a deferential one, requiring " 'restrained and disciplined judicial judgment so as not to interfere with the agency's factual conclusions'." *Supervisor v. Asbury Methodist Home,* 313 Md. 614, 625, 547 A.2d 190 (1988) (citing *Insurance Comm'r v. National Bureau,* 248 Md. 292, 309–10, 236 A.2d 282 (1967)). This deference applies not only to agency fact-

finding, but to the drawing of inferences from the facts as well. *St. Leonard Shores Joint Venture v. Supervisor of Assessments of Calvert County*, 307 Md. 441, 447, 514 A.2d 1215 (1986). "Where inconsistent inferences from the same evidence can be drawn, it is for the agency to draw the inferences." *Bulluck*, 283 Md. at 513, 390 A.2d 1119. When the agency's decision is predicated solely on an error of law, however, no deference is appropriate and the reviewing court may substitute its judgment for that of the agency. *Washington Nat'l Arena Ltd. Ptship v. Comptroller*, 308 Md. 370, 378–79, 519 A.2d 1277 (1987).

As to the role of the court in reviewing the credibility of witnesses testifying before an administrative agency, we have said:

> A reviewing court may, and should, examine facts found by an agency, to see if there was evidence to support each fact found. If there was evidence of the fact in the record before the agency, no matter how conflicting, or how questionable the credibility of the source of the evidence, the court has no power to substitute its assessment of credibility for that made by the agency, and by doing so, reject the fact.

*Commissioner, Baltimore City Police Dep't v. Cason*, 34 Md.App. 487, 508, 368 A.2d 1067 (1977); *accord Board of Appeals, Dep't of Employment & Training v. Mayor of Baltimore*, 72 Md.App. 427, 432, 530 A.2d 763 (1987); *Juiliano v. Lion's Manor Nursing Home*, 62 Md.App. 145, 153, 488 A.2d 538 (1985).

## DISCUSSION

We first point out that in zoning law a variance, if granted (unlike a special exception), permits a use which is prohibited and presumed to be in conflict with the ordinance. An applicant for a variance bears the burden of overcoming the presumption that the proposed use is unsuitable. That is done, if at all, by satisfying fully the dictates of the statute authorizing the variance.

*North v. St. Mary's County,* 99 Md.App. 502, 510, 638 A.2d 1175 (1994) (footnote omitted); *see also Evans v. Shore Communications, Inc.,* 112 Md.App. 284, 309, 685 A.2d 454 (1996) ("The burden on the petitioner is indeed heavy and springs from a recognition that variances permit uses that are prohibited and presumed to be in conflict with the ordinance.").

The pertinent standards for granting a variance [20] in the instant case, generally and within the Chesapeake Bay critical areas, are set forth in Anne Arundel County Code (1996), Article 3, Section 2–107, which reads:

§ 2–107.   Standards for granting variance.

(a) The County Board of Appeals may vary or modify the provisions of Article 28 [Zoning] of this Code when it is alleged that practical difficulties or unnecessary hardships prevent carrying out the strict letter of that article, provided the spirit of law shall be observed, public safety secured, and substantial justice done.   A variance may be granted only after determining:

(1) that because of certain unique physical conditions, such as irregularity, narrowness or shallowness of lot size and shape, or exceptional topographical conditions peculiar to and inherent in the particular lot, there is no reasonable possibility of developing the lot in strict conformance with this article;  or

(2) that because of exceptional circumstances other than financial considerations, the grant of a variance is necessary to avoid practical difficulties or unnecessary hardship, and to enable the applicant to develop such lot.

(b) For a property located in the critical area, a variance to the requirements of the County critical area program may be granted after determining that:

(1) due to the features of a site or other circumstances other than financial considerations, strict implementation of

---

**20.**   For an excellent discussion of the difference between special exceptions/conditional uses on one hand and variances, *see Cromwell v. Ward,* 102 Md.App. 691, 699–721, 651 A.2d 424 (1995).

the County's critical area program would result in an unwarranted hardship to the applicant;

(2) a literal interpretation of the Code of Maryland Regulations, Title 27, Subtitle 01, Criteria for Local Critical Area Program Development, or the County critical area program and related ordinances will deprive the applicant of rights commonly enjoyed by other properties in similar areas within the critical area of the County;

(3) the granting of a variance will not confer on an applicant any special privilege that would be denied by COMAR, Title 27, Subtitle 01 or the County critical area program to other lands or structures within the County critical area:

(4) the variance request:

(i) is not based on conditions or circumstances that are the result of actions by the applicant; and

(ii) does not arise from any condition relating to land or building use, either permitted or non-conforming, on any neighboring property; and

(5) the granting of the variance:

(i) will not adversely affect water quality or adversely impact fish, wildlife, or plant habitat within the County's critical area; and

(ii) will be in harmony with the general spirit and intent of the County critical area program.

(c) A variance may not be granted under subsection (a) or (b) of this section unless the Board finds that:

(1) the variance is the minimum variance necessary to afford relief;

(2) the granting of the variance will not:

(i) alter the essential character of the neighborhood or district in which the lot is located;

(ii) substantially impair the appropriate use or development of adjacent property;

(iii) be contrary to acceptable clearing and replanting practices required for development in the critical area; or

(iv) be detrimental to the public welfare.

(d) This section does not apply to Title 1B or § 15–104A of Article 28 of this Code.

We primarily are concerned with section 2–107(b) and (c) and their sub-parts. The obvious aim of section 2–107(b), as well as the critical areas regulations that it contemplates may be varied if certain findings can be made, is the protection of the environment and of natural resources, an objective long recognized in Maryland law to be a valid exercise of local zoning and planning regulations. *See Holiday Point Marina Partners v. Anne Arundel County,* 349 Md. 190, 208–09, 707 A.2d 829, 838 (1998).

An applicant for any variance has a heavy burden to adduce facts that not only meet the standard of "substantial evidence," but also to overcome the presumption that the proposed use or structure is unsuitable. *North,* 99 Md.App. at 510, 638 A.2d 1175. The applicant must meet this burden "by satisfying fully the dictates of [each and every element] of the statute authorizing the variance." *Id.* It is not enough for an applicant to demonstrate that his or her proposal, if allowed, would be suitable or desirable, would do no harm, or would be convenient for the applicant. *See Kennerly v. Mayor of Baltimore,* 247 Md. 601, 606–07, 233 A.2d 800 (1967). Moreover, "specific reasons, specific bases to support the finding must be revealed by the evidence before the Board." *Id.* at 607, 233 A.2d 800.

It is against this backdrop that we turn to our examination of the Board's decision in the instant case. As it turns out, we need not examine the Board's decision as to each of the required elements under § 2–107(b) and (c). If the decision fails on any element, it collapses. Thus, we shall confine our discussion to those parts of the Board's Memorandum of Opinion that we conclude most obviously lack the required evidentiary support.

### *Unwarranted Hardship § 2–107(b)(1)*

The Findings and Conclusions section of the Board's 14 November 1996 Memorandum of Opinion commingles within

various paragraphs the Board's express determinations as to a number of elements of § 2–107(b). Thus, it is necessary to separate for appellate scrutiny those portions pertaining to the unchallenged requests to erect decking on or adjacent to the Whites' home and a patio (and perhaps the proposed retaining wall, to the extent it is not included merely to facilitate installation of the swimming pool) from those portions purporting to justify the grant of the variance for the swimming pool. It appears to us that the Board's justification for concluding that it would be an unwarranted hardship for the Whites not to be able to construct a pool within the critical area buffer at the location proposed was expressed as follows (underlining denotes those portions that we consider relevant to the swimming pool aspect of the Whites' application, some of which may also relate to other elements of § 2–107(b) or (c)):

> *The Board finds that unique physical conditions exist on the property. This property is steeply sloped and wooded. The lot is also an irregularly shaped parcel with a pipestem driveway located significantly within the expanded buffer to the critical area.* The septic system consumes the bulk of the front yard which is the only flat area of the parcel. The location of the septic system forced construction of the existing residence towards the rear of the lot into the area of the steep slopes. The steep slopes allow at-grade access to the main floor from the front yard, but the main floor becomes a second story at the rear of the house. Although there are doors to provide rear safety access to the main floor, there is no decking or steps to allow the occupants to exit safely. The at-grade exit to the rear of the house is dirt and similarly does not provide proper safe access. The steep slopes in the rear yard appear difficult to stabilize and would be enhanced by the construction of the proposed retaining wall. *As a result of these unique physical conditions, there is no reasonable possibility of developing the lot as proposed without a variance to the Code requirements.*
>
> *The testimony of one of the Petitioners indicates that the proposed swimming pool is small. The record reflects that*

*several homes in the neighborhood have swimming pools. The proposed swimming pool would not be visible from most properties in the neighborhood due to the pipestem shape of the lot, the dense woods and its location to the rear of the house.* The Board noted that many homes in the neighborhood are improved with decks and retaining walls. As a result, the Board concludes that the granting of a variance will not alter the essential character of the neighborhood or district in which the lot is located, will not substantially impair the appropriate use or development of adjacent property, and will not be detrimental to the public welfare. The decking proposed is modest in depth and is attached to the house. *Because the pool cannot be moved to the front of the property as a result of the septic system, restrictive covenants and tree cover and cannot be moved closer to the house because of the location of the deck access, the Board concludes that the variance granted is the minimum to afford relief.*

*The property is located within the critical area, therefore, consideration of environmental impacts is essential. Because of the severe location restrictions and the lack of safety access to the rear of the main floor, insufficient access at grade to the rear of the house and inability to place a pool in the rear yard, the Board concludes that the features of this property would cause a strict implementation of the critical area program to result in an unwarranted hardship.*

At the outset of our analysis, we pause to note that we shall be considering whether the Board's decision is supported by substantial evidence based solely on the record as transmitted to this Court. This self-evident observation may seem axiomatic (it is) and unworthy of repetition; however, it is crucial to understanding what we believe may have been a fatal oversight on either the Board's and/or appellants' part in the variance proceeding below.

Anne Arundel County is a charter County. *See generally* Md.Code (1957, 1998 supp.), art. 25A. As such, the delegation of power to its Board is governed by Maryland Code, article

25A, section 5(U). Section 5(U)(4), among its provisions, authorizes the County "[t]o enact local laws providing ... for the decision by the board ... on the basis of the record before the board." Further, section 5(U) requires that the Board "shall file an opinion which shall include a statement of the facts found and the grounds for its decision."

The Board has adopted, and the County Council has approved, Rules of Practice And Procedure for its operations. *See* Anne Arundel County Code (1997), Appendix B, §§ 1–101 to 5–101. Section/Rule 4–101 of the Board's Rules provides, in pertinent part:

## TITLE 4. HEARINGS

Rule 4–101. Conduct of hearings.

(a) All hearings before the County Board of Appeals shall be public. No hearing shall be private even though all parties agree. All witnesses shall testify under oath, administered by the chairman, the Clerk or the Assistant Clerk. The chairman shall announce that persons attending the meeting who decline to testify may sign the witness list and thereby be provided with notice of all future proceedings involving the appeal.

(b) The Board shall furnish an official stenographer for taking testimony of the hearing in all appeals. Anyone desiring a transcript of the testimony may obtain a copy from the official stenographer and shall bear the full cost. The Board is not required to furnish a stenographer during an on-site inspection conducted pursuant to subsection (g) of this rule.

\* \* \* \* \*

(d) Evidence at the public hearing shall be presented first by the applicants, then by persons in opposition, and lastly by the County agency involved, unless otherwise designated by the Board.

\* \* \* \* \*

(g) *Upon request of any party or upon its own motion, Board members may visit the site which is the subject of the*

*appeal. Parties and their representatives may be present to observe, but no testimony may be taken. The parties or their representatives are prohibited from engaging in any discussion with Board members at the site visit. Board members are prohibited from engaging in any discussion with the parties or their representatives at the site visit. A member who has not participated in the site visit prior to the Board's vote on the appeal may not participate in the decision.*[21]

(Emphasis added). Both the Anne Arundel County Code (1992), article 3, § 1–104, and the Board's Rules (1994), Rule 3–104(b), prohibit ex parte communications by and between Board members, parties, and parties' representatives while a case is pending.

At the end of the Board's evidentiary hearing in the instant case on 9 September 1996, the Chair announced that it was the Board's intent to "conduct an on-site inspection" on 13· September 1996. This inspection would be done in two shifts, three members arriving at noon and two at 6:00 p.m. It is apparent from the Chair's comments that, with the express permission of Ms. White, the Board, invoking its "power" pursuant to Rule 4–101(g), was to "eye ball," if you will, the Whites' property and possibly its environs. The physical record as transmitted to us (and presumably as it existed before the circuit court and the Board), however, is silent as to whether the intended "on-site inspection" actually occurred or what the Board learned from such a visit if made. In its Memorandum of Opinion, in the Summary of Evidence section, · no mention is made of any additional facts or information obtained by the Board during any "on-site inspection."

---

**21.** We observe what we believe to be an internal inconsistency implicit in Rule 4–101. Despite the obvious general intent of the Rule to create and preserve a record of the evidence upon which a case is to be decided, subsection (g) of the Rule acknowledges an opportunity for Board members potentially to obtain additional input bearing on a case based on their observations while on a site visit. That additional input, if any, however, is in no way preserved on the record, at least insofar as subsection (g) is framed.

■ The foregoing digression before approaching our analysis of the Board's grant of the swimming pool variance occurs because, as we shall later explain, the record before us does not support the conclusion that there exists substantial, material, and competent evidence to support the Board's decision as to each element of § 2–107(b) and (c). "Without a record of the facts or the reasons for its action, a reviewing court cannot properly perform its duty of determining whether the action of the [Board] was arbitrary and capricious." *Mortimer v. Howard Research Dev. Corp.*, 83 Md.App. 432, 447, 575 A.2d 750 (1990) (citations omitted). We speculate, based on certain of the Board's findings and conclusions, that it may have seen conditions or things on its "on-site inspection" that affected its judgment, but which facts, information, or observations it did not include properly in the record. Obviously, we cannot consider in aid of determining whether the Board's decision is affirmable anything that is not in the record. To the extent the Board obtains information from such an "on-site inspection," and such information is not already a matter of record in the pending case and is material to the ordinance requirements and the Board's decision, the Board would do well for itself and parties before it in the future to conceive of a technique to supplement the record with such evidence before rendering its decision. In doing such, the Board needs also to be mindful of the right of opposing parties to be apprised of that additional evidence, and given an opportunity to respond.

■ Returning to our main task, we note that the record contains only fragmentary and imprecise evidence as to the topography or vegetative conditions of the Whites' lot prior to their 1990 site grading, excavation, and re-distribution of earth. The record is devoid of any substantial evidence that would permit comparison of the topography, vegetation (or lack thereof), or shape of the Whites' lot, whether before or after 1990, with any other lot abutting, adjacent, or nearby to the Whites' property. Moreover, whether and to what extent other properties, regardless of whether such were in the undefined "neighborhood" of the Whites' property, are affect-

ed by the critical areas regulations relevant to the Whites' variance application is wholly unexplored territory on this record, at least insofar as such information could be viewed as supportive of the Board's decision. It is implicit in the requirement of § 2–107(b)(1) that the "features of the site or other circumstances" that lead to the finding of an unwarranted hardship must be unique to the Whites' property and not shared by neighboring properties. *See Cromwell v. Ward,* 102 Md.App. 691, 719, 721, 651 A.2d 424 (1995).

Before the Board, appellants' counsel, near the end of his closing argument at the 9 September 1996 hearing, argued boldly (and without citing authority) that it would deny appellants a reasonable use of their property if the swimming pool variance were not approved. On appeal to this Court, appellants muster a similar argument, but with more authoritative constitutional gloss.[22] This argument, we conclude, is misguided.

Appellants' constitutional syllogism goes like this: (1) Neither of the objectives intended to be benefitted by the imposition of the critical areas buffer requirements (protection of water quality through the control of storm water runoff problems and protection of the habitat, according to Ms. Herger's

---

22. An argument can be made that appellants have failed to preserve properly for appellate review any constitutional argument in this matter. As noted previously in the factual recitation, *supra* at 215, 708 A.2d at 1102 appellants waited until closing argument before the Board to make reference (and then in both a passing and oblique manner) to any assertion that denial of their variance request as to the swimming pool, in their view, would have constitutional implications. For obvious reasons, the Board majority opinion did not decide directly this "lip service" constitutional innuendo. We think it open to some question whether appellants' argument to us that a taking of constitutional dimension would occur unless the variance is granted is properly before us on this record. *See Holiday Point Marina v. Anne Arundel County,* 349 Md. 190, 707 A.2d 829 (1988); *see also Insurance Comm'r v. Equitable Life Assurance Society,* 339 Md. 596, 619, 664 A.2d 862 (1995) ("[W]here a party is not challenging the validity of a statute as a whole, but is arguing that the statute as applied in a particular situation is unconstitutional, and where the legislature has provided an administrative remedy, this Court has regularly held that the constitutional issue must be raised and decided in the statutorily prescribed administrative and judicial review proceedings.").

testimony) would be harmed by appellants' swimming pool in the location proposed. (2) To the contrary, additional stabilization of existing impervious soils in the area of the steep slope within the buffer and interception of rainfall on the surface of the pool would advance the protection of water quality, presumably over the natural, though altered, condition. Further, there was no evidence that the habitat of any particular flora or fauna would be harmed by the pool's installation. (3) Consequently, denying the variance in the face of such evidence merely because the regulations prohibited a swimming pool in the expanded buffer generally denies the Whites an economically beneficial, productive, or reasonable use of their land, to wit, a taking in a constitutional sense. (4) Finally, sprinkled throughout appellants' argument are citations to and excerpts from *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987); *Steel v. Cape Corp.*, 111 Md.App. 1, 677 A.2d 634 (1996); and *North v. St. Mary's County*, 99 Md.App. 502, 638 A.2d 1175 (1994), as authorities supporting appellants' taking argument.

The most obvious flaw in appellants' constitutional formula is their dependence on the assumption that denial of any reasonable use will give rise to a taking. In *Baltimore City v. Borinsky*, 239 Md. 611, 212 A.2d 508 (1965), the Court of Appeals adopted a strict and exacting standard in this regard, holding:

"If the owner affirmatively demonstrates that the legislative or administrative determination deprives him of all beneficial use of the property, the action will be held unconstitutional. *But the restrictions imposed must be such that the property cannot be used for any reasonable purpose.* It is not enough for the property owners to show that the zoning action results in substantial loss or hardship."

*Id.* at 622, 212 A.2d 508 (emphasis added).

Appellants urge that, under the more recent Supreme Court pronouncements, that is no longer the test. It seizes upon the

articulation in *Nollan*, 483 U.S. at 834, 107 S.Ct. at 3147, and *Lucas*, 505 U.S. at 1015, 112 S.Ct. at 2893, that a regulation may constitute a taking if it denies the owner of "economically viable use of his land." At least implicit in their argument is that an owner can be denied the economically viable use of his land even though he is not denied "all beneficial use."

The simple and most direct answer to this assertion is that appellants have overlooked the important modifier "all." In *Lucas*, the Supreme Court made clear that the standard was whether the regulation "denies *all* economically beneficial or productive use of land." *Lucas*, 505 U.S. at 1015, 112 S.Ct. at 2893 (emphasis added). The Court later supplied its own emphasis to the word "all" when it stated that an owner suffers a taking when he has been called upon "to sacrifice *all* economically beneficial uses in the name of the common good, that is to leave his property economically idle." *Id.* at 1019, 112 S.Ct. at 2895. In *Waters v. Montgomery County*, 337 Md. 15, 650 A.2d 712 (1994), the Court of Appeals noted that, under *Lucas*, a regulation does not go "too far" unless it "denies *all* economically beneficial or productive use of land." *Id.* at 40, 650 A.2d 712 (quoting *Lucas*, 505 U.S. at 1015, 112 S.Ct. at 2893 (emphasis added)). The Court of Appeals then reiterated the *Borinsky* test, that "[t]o constitute a taking in the constitutional sense ... the state action must deprive the owner of all beneficial use of the property." *Waters*, 337 Md. at 40–41, 650 A.2d 712 (quoting *Pitsenberger v. Pitsenberger*, 287 Md. 20, 34, 410 A.2d 1052 (1980)).

▮▮▮▮ As is obvious from the record in the instant case, appellants will continue to enjoy their primary residence on the subject property. With the addition of the decking, retaining wall, and patio authorized by the unchallenged parts of the variance, that use will be further enhanced. The addition of a swimming pool would be an amenity, as Ms. White testified. The absence of a pool, by virtue of the application of the critical areas buffer requirements and prohibitions, does not amount to a constitutionally-cognizable taking on the record of this case. The absence of the Whites' desired

pool is no more a hardship than was the denial of Mr. Enoch's gazebo in *North v. St. Mary's County.* *See North,* 99 Md.App. at 519, 638 A.2d 1175.

### Deprivation of Rights Commonly Enjoyed by Other Properties Within Critical Area § 2–107(b)(2)

### AND

### No Special Privilege Conferred On Appellants § 2–107(b)(3)

It appears to us that the Board's additional findings and conclusions explaining further why it favorably found for appellants under these two sub-sections is contained essentially in the following portion of the Memorandum of Opinion (again, relevant determinations as to the pool are underscored):

> *The Board finds that the swimming pool would not negatively impact the critical area because it acts as a catch basin for storm water. Thus, the runoff on the steep slopes will be lessened and the slopes stabilized by the concrete. The water in the pool can freely evaporate and recharge the hydrology of the ecosystem, but will not cause erosion and situation into the critical area.* The retaining wall will assist in slope stabilization and the pervious decking will decrease erosion from pedestrian traffic. *As a literal interpretation of the relevant COMAR and County Code provisions would prohibit the Petitioners from constructing decks, a retaining wall and a pool as their neighbors have, the Board concludes that such an interpretation would deprive the Petitioners of rights commonly enjoyed by other property owners in the area, and within the critical area. For the same reason, the granting of this variance will not confer on the Petitioners any special privilege that otherwise would be denied.*

Although there was evidence meeting the substantial evidence standard to support the Board's findings as to arguably beneficial effects from the construction of the pool on soil

stabilization and rain water interception, it is a complete *non sequitur* to conclude from such findings or evidence that denial of the variance would deprive appellants of "rights commonly enjoyed by other properties in similar areas within the critical area of" Anne Arundel County. Likewise, viewed through the reverse prism of whether the grant of the variance would confer a special privilege on appellants that would be denied otherwise "to other lands or structures within the [Anne Arundel] County critical area," the Board's conclusion is no more logical.

As noted previously, there is no evidence [23] in the record bearing on which (if any) of the Whites' neighbors, with waterfront or non-waterfront properties, have swimming pools. It follows, therefore, that when any such neighbor's pool was constructed, vis à vis the date of full implementation of the County's critical areas regulatory framework, or, if constructed following adoption of the County's critical areas program, whether such was done under color of a variance such as that sought here by the Whites, also goes unaddressed on this record.[24] Without some substantial, material, and credible evidence bearing on these matters, the Board's conclusions are arbitrary and capricious.

### Conditions or Circumstances Not The Result of Actions By Applicant § 2–107(b)(4)(i)

The Board concluded that:

The lot conditions that cause the unwarranted hardship were not created by the Petitioners. Therefore, the request

---

**23.** When we refer to evidence, we mean substantial evidence. As that term has been described somewhat metaphysically, ten gossamers of evidence equals a scintilla, and more than a scintilla is required to achieve the critical mass of substantial evidence. *See Turner v. Hammond,* 270 Md. 41, 60, 310 A.2d 543 (1973).

**24.** The only "evidence" on this topic was testimony by opposition witnesses that no variances had been granted in Anne Arundel County since imposition of the expanded buffer regulations and, therefore, any pools now existing in areas encompassed by the buffer were installed when such was not prohibited.

for the variance is not based on conditions or circumstances that are the result of actions by the Petitioners. Likewise, the variance request does not arise from any condition relating to land or building use on any neighboring properties.

Although this element of the required findings under § 2–107(b) was not challenged expressly by the opposition witnesses before the Board (nor by appellee before the circuit court and only weakly before us), there seems grave doubt from our review of the record that substantial evidence exists to support the Board's decision in this regard as well.

Considering the evidence in a light most favorable to the Whites and the Board, we view the major premise to be that the Whites (and their consultants) did not realize during the planning and construction of their home that the critical areas regulations generally, and the expanded buffer prohibitions specifically, were either enacted or in the process of being imminently enacted. Had they known better, and therefore realized that the movement of the proposed house location necessitated by the Health Department's insistence on siting the septic field in the front yard would cause the Whites' house location to be pushed further to the rear of the lot (with attendant grading and excavation for the house site) and a logical rear yard pool site accordingly pushed into the steep slopes that would become the expanded critical area buffer, they would have constructed the pool, in the location proposed in the variance application, in 1990 when they built the house. Not only is such a justification a prime example of bootstrapping, it is unsupported by the record.

As we noted earlier, *supra* at 205, n. 11, 708 A.2d at 1098, n. 11, the critical areas regulations in Anne Arundel County were up and operative by May 1988. As the Whites did not commence construction of their home proper until 1990, even had they been fully informed of the status and progress of the critical areas law and regulations at that time, they could not have built the pool in 1990 where they proposed in 1995, free of the need for a variance. In point of fact, Ms. White explained the absence of a pool on the 1990 building plans as

"probably just an oversight." No external force majeure was blamed by appellants' evidence for preventing them from building the pool at that time. It is difficult to imagine then, confining ourselves to appellants' apparent theory, why the presently alleged unwarranted hardship was created other than by appellants' negligent omission. *See Ad + Soil, Inc. v. County Comm'rs of Queen Anne's County,* 307 Md. 307, 340, 513 A.2d 893 (1986).

Of additional relevance on this point is appellants' uncontested evidence that they cleared, excavated, and graded the lot, between 1987 and 1990, in such a way as to turn "a gradual slope" into a "15 percent slope." Specifically, "the area where the pool was proposed ultimately was disturbed and created by the grading for the house." In the process, the permeability of the soil was changed from loamy sand (with a clay layer "somewhere" beneath) to sandy clay, or, as Mr. Werner put it, the "more permeable" pre-grading soils became "relatively impervious." To later premise in any way the site's uniqueness for variance justification purposes on the steep slopes and soils susceptible to erosion created by appellants' actions cannot form a reasoned basis for the Board to conclude that conditions or circumstances causing an unwarranted hardship were not, in any part, the result of appellants' actions.

For the foregoing reasons, we are in agreement with the circuit court's analysis that, on this record, the Board's grant of the variance as to the Whites' swimming pool proposal was arbitrary and capricious.

JUDGMENT AFFIRMED; APPELLANTS TO PAY THE COSTS.